Dueeee, Judge,
delivered tbe opinion of tlie court:
The plaintiff is in the business of manufacturing wood products. In December 1950 and January 1951 it entered into two contracts with the Department of the Army for the manufacture of wood desks and tables. The contracts were terminated by the defendant as to the desks for default in delivery in September 1951 and the plaintiff alleges a series of arbitrary and capricious actions: in the termination itself, in the manner of procuring replacement contracts, and in the appellate decision of the Armed Services Board of Contract Appeals. The Government incurred excess replacement costs in reletting the contracts which costs were withheld from monies otherwise due the plaintiff. Plaintiff’s claim in this action is for the recovery of that amount.
Plaintiff filed two appeals to the Under Secretary of the Army from the contracting officer’s notices of termination. This was the first such action although the contracting officer had thrice previously ordered partial termination of the desk contracts. These appeals offered reasons why the plaintiff believed that its default in delivery was excusable. Supplementary appeals complained that the contracting officer ought to have permitted the plaintiff to continue to deliver notwithstanding the decision to terminate.
The two contracts were similar in all significant aspects. The disputes clause provided that the contractor could appeal within 30 days from a decision of the contracting officer to the Secretary of the Army and that the decision of the Secretary or his representative would be final and conclusive. During the pendency of the appeals before the Armed Services Board of Contract Appeals, plaintiff claimed, for the first time, that the conduct of defendant’s inspector had baused unforeseeable production delays. This allegation was not made within the 30-day appeal period referred to' in the disputes clause. The appeals board decided in April 19.54 that the termination action was proper, that the assessment of excess costs was proper, and that the Government had hot failed to minimize damages.
In view of plaintiff’s allegations of arbitrary and capricious conduct by the contracting officer and by the appeals board, and since the appeals board found the termination *538 to have been correct in law, we have granted the plaintiff a trial de novo. See Wunderlich Act, 68 Stat. 81, 41 U.S.C. §§ 321, 322 (1958 Ed.) ; Volentine & Littleton v. United States, 136 Ct. Cl. 638 (1956) ; P.L.S. Coat & Suit Corp. v. United States, 148 Ct. Cl. 296 (1960). As a result, we have before us not merely the administrative record but all of the pertinent facts of this case.
We believe that the evidence before us conclusively establishes the soundness of the appeals board decision, that the decision to terminate the contracts was legally correct in view of the admitted default, and that none of the actions taken by the Government, particularly in the termination and reletting of the contracts, was arbitrary or capricious.
There is no question that plaintiff was in serious default in delivery on all phases of its contracts on the date that the desks were ordered fully terminated. Plaintiff alone was responsible for this situation and its default cannot be characterized as excusable. Plaintiff’s president and a draftsman employed by the company misinterpreted the contract specifications and a large quantity of desks were produced according to outmoded specifications before this error was discovered. Meanwhile, this log-jam of unacceptable desks forced a slow-down of the entire production line. Before the desks were cleared out of the plant the impairment of plaintiff’s ability to meet delivery schedules had become irreparable.
Plaintiff blames the defendant for not promptly dispatching an inspector to clear the completed items and make room for further production, but we do not think this contention is valid. The contract required the manufacturer to notify the Army when the services of an inspector were required. There is no evidence that Lester Bros, gave any such notification before February 13,1951, the date on which the inspector arrived at the plant. Moreover, when the inspector did arrive, there was nothing he could do to expedite Government acceptance of the desks on hand since it was quite clear to all parties that they failed to meet specifications. It took about a month for change orders to be issued which would have rendered these desks acceptable and by the *539 time they were issued the plaintiff had already disposed of most, if not all, of the finished desks.
In addition to the production stoppage because of the backlog of unacceptable desks, the record shows that plaintiff’s president listed several factors which he believed excused the delay. They were: the changeover from civilian production, the acquisition and installation of new machinery, and delay in the delivery of hardware. None of these factors are attributable to the actions of the defendant.
The defendant suggests that plaintiff has waived its right to complain that the inspection procedures of the Government’s representative contributed to the delays since this complaint was not made within the 30-day appeals period of the contract. We are not prepared to say that this constitutes a failure to exhaust an administrative remedy since the appeals from the termination action on other grounds were certainly timely. Had no timely appeal been pursued at all, we might be required to decide otherwise. In any event, it appears that this ground for appeal was before the Armed Services Board of Contract Appeals when it considered this case. As a matter of evidence, however, the only delays caused by defendant’s inspectors occurred when they rejected items which did not meet the contract specifications, a condition to acceptance on which they had every right to insist.
In view of the fact that the contract items were urgently required for support of the United States’ efforts in the defense of the [Republic of Korea, we are of the view that the defendant’s method of procuring replacement contracts was not imprudent. It was necessary to obtain quick delivery of the desks and it was only natural for the defendant to attempt to make up for lost time by contracting the work originally given to the plaintiff to a number of manufacturers. To have advertised for bids in the same manner as it had originally done, would have cost the defendant additional delay. Furthermore, in the first instance, solicitation from a very large number of manufacturers had elicited responses from less than one percent. Yet when replacement contractors were sought, seven out of about a dozen contacts replied. The contracting officer acted judiciously in re- *540 letting the contracts, yet he was also more than fair with the plaintiff. He permitted plaintiff to make some additional deliveries of desks even after the date of the termination.
It is our conclusion that the Government legally terminated the contracts at issue, and no arbitrary action has been shown in connection with the termination or reletting. Furthermore, the defendant did not fail to minimize its damages and the reletting procedures and the excess costs resulting therefrom were proper. Consequently, the plaintiff’s petition must be dismissed.
It is so ordered.
Laramore, Judge; Madden, Judge, and Jones, Chief Judge, concur.
Whitaker, Judge, took no part in the consideration and decision of this case.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner William E. Day, and the briefs and argument of counsel, makes findings of fact as follows:
1. At all times material herein plaintiff was, and still is, a Virginia corporation, engaged in the business of manufacturing wood products, with its principal office and place of business at Martinsville, Virginia. Plaintiff’s president, Lawson L. Lester, Jr., acted on behalf of plaintiff in all its dealings with defendant.
2. On October 23, 1950, the defendant, through the Chicago Quartermaster Depot, United States Army Quartermaster Purchasing Division, issued to over 300 prospective bidders its invitation to bid on a large quantity of office desks and tables of both steel and wood construction.
The plaintiff, on November 4, 1950, submitted its bid on a quantity of wood desks and tables. On December 4, 1950, the plaintiff was, in accordance with its bid, awarded a contract, numbered DA 11-009-QM-4133 (hereinafter referred to as 4133) for the furnishing at stated prices, f.o.b. point of delivery, of 3,078 executive double pedestal 34 x 60 office desks, 1,947 secretarial double pedestal 34 x 60 desks, with typewriter compartment in left pedestal, and 1,947 similar *541 secretarial desks except with, typewriter compartment in right pedestal. This was a total of 6,972 desks.
In addition, the award was for 2,513 wood office tables of sizes from 24 x 36 to 34 x 72. The award was for a contract price of $474,893.30.
3. Upon receiving telegraphic notice of award, Lawson Lester went to Chicago to discuss the award with the contracting officer and his representatives there. Lester was informed that additional wood desks and tables were needed by the defendant and that an invitation to bid upon them would be issued. Such invitation was issued on December 6 for public opening on December 18,1950. On December 15, 1950, the plaintiff bid on this additional requirement. On January 17,1951, the plaintiff was awarded contract DA-11-009-Q,M-5667 (hereinafter referred to as 5667) in the total sum of $957,153.88 for desks and tables similar to those described in the earlier award but for delivery f.o.b. different destinations. This contract covered a total of 11,436 desks and 4,319 tables.
4. All items awarded -were priced f.o.b. point of delivery, and all the desks were to be made in accordance with General Services Administration specification No. 265B dated 6 October 1949. The total contract price for contract 4133 was $474,893.30 and for contract 5667, $957,153.88. Except for quantities, f.o.b. destination, delivery dates, and certain subsequently issued change orders (pertinent portions of which are discussed later), all other pertinent terms and conditions of the two contracts were the same, both having been issued under the same procurement directive: P/D CG 3-0031-0A-l-07.
5. [Required delivery schedules on the respective contracts were as follows:

*542

6. The above supplies were wholly or in part for emergency procurement in aid of United States military support of the independence of the Republic of Korea.
7. Pertinent contract clauses (the same in both contracts) read as follows:
NO PRIORITY RATING. — No rating will be applied on any contract awarded hereunder. Any bid either requesting a rating or making bid contingent upon the application of a rating will not be considered.
Packing. — Supplies will be packed in accordance with one of the following methods:
# * * sH *

Method III

In wood crate, Style B, constructed in accordance with U.S. Army Specification No. 100-73 dated 7 May 1948, except that minimum size of lumber used shall be nominal 1" x 4". * * *
INSPECTION AND ACCEPTANCE: Saving and reserving to the Government all rights under the Inspection provision, the procedure of Inspection for compliance with contract requirements at contractor’s plant and inspection (quantity and condition) and acceptance at destination will be followed.
_ Shipment must NOT be made prior to inspection by either the Chief, QM Inspection Division, Chicago Quartermaster Depot, or his authorized representatives. Contractor must notify the Chief, QM Inspection Division, Chicago Quartermaster Depot, 1819 West Pershing Road, Chicago 9, Illinois, when the items as called for herein are ready for inspection. ITEMS SHOULD NOT BE PACKED IN SEALED CONTAINERS PRIOR TO INSPECTION. (If practicable % weeks advance notice is requested.) Should shipping point differ from that which is shown herein, contractor must *543 so advise both the Contracting Officer and the Chief, QM Inspection Division, Chicago Quartermaster Depot.
$ $ $ $ ‡
5. INSPECTION
(a) All supplies (which term throughout this clause includes without limitation raw materials, components, intermediate assemblies, and end products) shall be subject to inspection and test by the Government, to the extent practicable at all times and places including the period of manufacture, and in any event prior to final acceptance.
(5) In case any supplies or lots of supplies are defective in material or workmanship or otherwise not in conformity with the requirements of this contract, the Government shall have the right either to reject them (with or without instructions as to their disposition) or to require their correction. Supplies or lots of supplies which have been rejected or required to be corrected shall be removed or corrected in place, as requested bv the Contracting Officer, by and at the expense of the Contractor promptly after notice, and shall not again be tendered for acceptance unless the former tender and either the rejection or requirement of correction is disclosed. If the Contractor fails promptly to remove such supplies or lots of supplies, when requested by the Contracting Officer, and to proceed promptly with the replacement or correction thereof, the Government either (i) may by contract or otherwise replace or correct such supplies and charge to the Contractor the cost occasioned the Government thereby, or (ii) may terminate this contract for default as provided in the clause of this contract entitled “Default.” Unless the Contractor elects to correct or replace the supplies which the Government has a right to reject and is able to make such correction or replacement within the required delivery schedule, the Contracting Officer may require the delivery of such supplies at a reduction in price which is equitable under the circumstances. Failure to agree to such reduction of price shall be a dispute concerning a question of fact within the meaning of the clause of this contract entitled “Disputes.”
(c) If any inspection or test is made by the Government on the premises of the Contractor or a subcontractor, the Contractor without additional charge shall provide all reasonable facilities and assistance for the safety and convenience of the Government inspectors in the performance of their duties. If Government inspection or test is made at a point other than the premises of *544 the Contractor or a subcontractor, it shall be at the expense of the Government: Provided, That in case of rejection the Government shall not be liable for any reduction in value of samples used in connection with such inspection or test. All inspections and tests by the Government shall be performed in such a manner as not to unduly delay the work. The Government reserves the right to charge to the Contractor any additional cost of Government inspection and test when supplies are not ready at the time such inspection and test is requested by the Contractor. Final acceptance or rejection of the supplies shall be made as promptly as practicable after delivery, except as otherwise provided in this contract; but failure to inspect and accept or reject supplies shall neither relieve the Contractor from responsibility for such supplies as are not in accordance with the contract requirements nor impose liability on the Government therefor.
{d) The inspection and test by the Government of any supplies or lots thereof does not relieve the Contractor from any responsibility regarding defects or other failures to meet the contract requirements which may be discovered prior to final acceptance. Except as otherwise provided in this contract, final acceptance shall be conclusive except as regards latent defects, fraud, or such gross mistakes as amount to fraud.
(e) The Contractor shall provide and maintain an inspection system acceptable to the Government covering the supplies hereunder. Records of all inspection work by the Contractor shall be kept complete and available to the Government during the performance of this contract and for such longer period as may be specified elsewhere in this contract.
*****
11. DEFAULT
(a) The Government may, subject to the provisions of paragraph (b) below, by written Notice of Default to the Contractor terminate the whole or any part of this contract in any one of the following circumstances:
(i) if the Contractor fails to make delivery of the supplies or to perform the services within the. time specified herein or any extension thereof; or (ii) if the Contractor fails to perform any of the other provisions of this contract, or so fails to make progress as to endanger performance of this contract in accordance with its terms, and in either of these two circumstances does not cure such failure within a period of 10 days (or such *545 longer period as the Contracting Officer may authorize in writing) after receipt of notice from the Contracting Officer specifying such failure.
(&) The Contractor shall not be liable for any excess costs if any failure to perform the contract arises out of causes beyond the control and without the fault or negligence of the Contractor. Such causes include, but are not restricted to, acts of God or of the public enemy, acts of the Government, fires, floods, epidemics, quarantine restrictions, strikes, freight embargoes, unusually severe weather, and defaults of subcontractors due to any of such causes unless the Contracting Officer shall determine that the supplies or services to be furnished by the subcontractor were obtainable from other sources in sufficient time to permit the Contractor to meet the required delivery schedule.
(c)_ In the event the Government terminates this contract in whole or in part as provided in paragraph (a) of this clause, the Government may procure, upon such terms and in such manner as the Contracting Officer may deem appropriate, supplies or services similar to those so terminated, and the Contractor shall be liable to the Government for any excess costs for such similar supplies or services: Provided, That the Contractor shall continue the performance of this contract to the extent not terminated under the provisions of this clause.
(d) If this contract is terminated as provided in paragraph (a) of this clause, the Government, in addition to any other rights provided in this clause, may require the Contractor to transfer title and deliver to the Government, in the manner and to the extent directed by the Contracting Officer, (i) any completed supplies, and (ii) such partially completed supplies and materials, parts, tools, dies, jigs, fixtures, plans, drawings, information, and contract rights (hereinafter called “manufacturing materials”) as the Contractor has specifically produced or specifically acquired for the performance of such part of this contract as has been terminated; and the Contractor shall, upon direction of the Contracting Officer, protect and preserve property in possession of the Contractor in which the Government has an interest. The Government shall pay to the Contractor the contract price for completed supplies delivered to and accepted by the Government, and the amount agreed upon by the Contractor and the Contracting Officer for manufacturing materials delivered to and accepted by the Government and for the protection and preservation of property. Failure to agree shall be a dispute concerning a *546 question of fact within the meaning of the clause of this contract entitled “Disputes.”
(e) If, after notice of termination of this contract under the provisions of paragraph (a) of this clause, it is determined that the failure to perform this contract is due to causes beyond the control and without the fault or negligence of the Contractor pursuant to the provisions of paragraph (5) of this clause, such Notice of Default shall be deemed to have been issued pursuant to the clause of this contract entitled “Termination for Convenience of the Government,” and the rights and obligations of the parties hereto shall in such event be governed by such clause. (Except as otherwise provided in this contract, this paragraph (e) applies only if this contract is with a military department.)
(/) The rights and remedies of the Government provided in this clause shall not be exclusive and are in addition to any other rights and remedies provided by law or under this contract.
12. DISPUTES
Except as otherwise provided in this contract, any dispute concerning a question of fact arising under this contract which is not disposed of by agreement shall be decided by the Contracting Officer, who shall reduce his decision to writing and mail or otherwise furnish a copy thereof to the Contractor. Within 30 days from the date of receipt of such copy, the Contractor may appeal by mailing or otherwise furnishing to the Contracting Officer a written appeal addressed to the Secretary, and the decision of the Secretary or his duly authorized representative for the hearing of such appeals shall be final and conclusive: Provided, That if no such appeal is taken, the decision of the Contracting Officer shall be final and conclusive. In connection with any appeal proceeding under this clause, the Contractor shall be afforded an opportunity to be heard and to offer evidence in support of its appeal. Pending final decision of a dispute hereunder, the Contractor shall proceed diligently with the performance of the contract and in accordance with the Contracting Officer’s decision.
*****
8. Pertinent portions of General Services Administration specification No. 265B follow:
3.1.1 Wood.
3.1.1.1 Characteristics. — The solid wood and veneer used for the exposed parts of the desks shall be bright, *547 well sanded, and free from brashness, discolorations, worm holes, splits and shake. On walnut and mahogany-wood, burls, pin knots not exceeding two per square foot average, inconspicuous small patches, and sapwood not exceeding 10 per cent, may be admitted. On oak, birch, maple, pecan, hackberry and sweet gum wood a few small burls, a few pin knots, sapwood not exceeding 10 per cent, mineral streaks not exceeding y32 inch by 4 inches or % 6 inch by 2 inches and not more than one per 12 inch square, and inconspicuous small patches, may be admitted.
3.1.1.2 Seasoning. — All wood shall be uniformly kiln-dried to a moisture content not exceeding 8 percent.
* ❖ * * ‡
3.1.5.1 Foot sockets. — Foot sockets shall be made of brass. They shall be 1% inches in height. The exterior of the foot socket shall be flush with the wood of the desk leg. The foot socket shall be not less than 22 gauge in thickness. The foot socket shall have a flat closed bottom.
*****
3.2.3 Type /, class 1 desks. — The desks shall conform in detail to the design as shown in figures 1 and 2 and shall be constructed as follows:
3.2.3.1 Framing. — The framing shall be by mortise and tenon or by driven dovetail. Mortises shall be at least y2 inch deep and tenons shall be approximately the full depth of the mortise. The thickness of tenons on panel rails shall be not less than ^4 inch. The thickness of tenons on drawer rails shall be not less than %6 inch.
*****
3.2.3.4 Tops. — The tops shall be of 5-ply construction, with a core of chestnut, basswood, poplar, cottonwood, soft maple, or sweet gum. The core shall be built up of strips not more than 4 inches wide with flat butt joints or tongue and groove joints. The cross-band veneers shall be not less than y20 inch thick and shall be laid at right angles to the core. The top surface veneers shall be as specified in table I, and the underside surface veneers shall be of hardwood. After 5-ply gluing, the tops shall be banded all around with a solid molding which shall be not less than s/ie inch thick nor more than ,y2 inch thick. This molding shall be rounded on the top edges and corners on a radius of at least % inch. The tops shall be not less than 1^4 inches thick. The tops shall be securely fastened to the bases by iron lugs which *548 shall be countersunk into the writing bed and securely screwed to the tops, rails, posts, and legs.
* * « * *
3.2.4Type /, class £ desks. — The desks shall conform to the construction requirements specified in 3.2.3, except that the design shall be as shown in figure 3.
# * * * *
3.2.5.2 Typewriter compartments — The typewriter compartment shall be in the left pedestal for style A desks and in the right pedestal for style B desks. The compartment door shall be made to imitate the drawer front in the opposite pedestal, and shall be hinged to the outside leg with hinges which will permit the door to open to a right angle to the front of the desk. The inside surface of the door when open shall be flush with the inside of the leg to allow full clearance for the typewriter bed. The door shall be stopped at a right angle by a sliding catch attached both to the door and to the top of the bottom rail.
3.2.5.3 Typewriter platform. — The typewriter platform shall be horizontally located and shall provide ample clearance for all standard correspondence model typewriters. The platform shall be 5-ply and not less than I14 inches thick. A % inch thick front stop which extends % inch above and % inch below the platform shall be provided. This front stop shall be tongued and grooved along the entire front edge of the platform. The top and bottom edges of the front stop shall be rounded to a y2 inch radius. A % inch thick back stop which extends above the platform to fill the space between the platform and the top partition rail shall be provided. The core of the platform shall be banded along the sides with the same wood as the solid exterior parts.
3.2.5.4 Typewriter platform mechanism. — The typewriter platform mechanism shall operate smoothly and with a minimum of effort in the raising and lowering position, with the typewriter in place on the platform. The platform shall remain in a firm operating position with or without a typewriter. There shall be a minimum of vibration while the typewriter is in use. The platform mechanism shall include a simple metal locking device which shall lock automatically when the platform is raised to the operating position.
*****
3.4 Identification marking. — Each desk shall be permanently marked in an inconspicuous place in a plain and legible manner with the type, class, and style of the desk, the date of manufacture, and the manuxacturer’s *549 name or trade-mark of such known character that the source of supply may be readily determined.
^ í ‡ ^
3.5 _ Worlcmansliip. — The method of construction, veneering, joining, assembly, and finishing shall be characteristic of first class furniture and cabinet work in every detail.
4. SAMPLING, INSPECTION, AND TEST PROCEDURES
4.1 8 am fling. — A representative sample desk shall be selected from those under construction or from each delivery, for purposes of inspection. A representative sample panel for delamination tests shall be selected from those intended for use in the desks.
4.2 Inspection. — The desks shall be inspected to determine compliance with this specification as to workmanship, materials, design, details of construction, hardware, finish, markings, and packing. Inspection shall be made at the factory by a representative of the Government at any time during process of manufacture, or at point of delivery.
$ * ‡ ‡
9. On September 14, 1951, defendant terminated contracts 4133 and 5667 for failure of plaintiff to make deliveries on schedule and defendant later charged back against plaintiff a total amount of $94,725.24 and withheld this amount from moneys otherwise due plaintiff. The Government actually incurred and paid excess costs of this amount in order to re' place the terminated contracts. More particularly, on contract 4133 plaintiff was terminated in the amount of 1,551 desks of all types at a replacement cost of $29,556.10, as finally determined, and on contract 5667 plaintiff was terminated on 5,323 desks of all types at a replacement cost of $65,169.14, as finally determined. It is the sum total of these amounts, $94,725.24, that plaintiff seeks to recover here.
10. Plaintiff failed to meet the delivery schedules as set forth in the contracts. Its first delivery of any item was made on March 17, 1951, at which time 36 executive type desks were delivered under contract 4133. Delivery under contract 5667 did not commence until June 16, 1951, with a shipment of 96 secretarial desks. The first delivery of tables was made on July 5,1951, with a shipment of 67 under con *550 tract 4133. Table shipments on contract 5667 commenced on September 12,1951.
11. Although plaintiff was not terminated on either contract as respects tables, their delivery was not completed until December 11, 1951, on contract 4133, and on December 28, 1951, on contract 5667.
12. Plaintiff had earlier been terminated on certain quantities of desks on both contracts. On these earlier terminations, however, the Government did not assess excess replacement costs because it procured a dissimilar item on replacement. The contracting officer procured dissimilar items on the earlier termination because he was anxious to meet the urgent supply situation, and whenever he was able to locate desks that would perform the job he bought them and terminated plaintiff’s contracts accordingly.
Thus, besides the September 14th notice of termination, other notices of termination were sent to plaintiff as follows:

Quantity Bate Contract terminated

June 4, 1951_ 5667 3,000 desks.
June 28, 1951_ 5667 914 desks.
August 7,1951_ 5667 1,270 desks.
June 28, 1951_ 4133 2,188 desks-
The notices of termination, as mentioned above, did not result in the assessment of any excess costs against the plaintiff.
13. The initial steps taken by the plaintiff toward performance of the two contracts were beset with difficulties for which the defendant was in no way responsible. The plaintiff did not have a full time draftsman employed at its plant. In order to have shop drawings for the desks prepared, Mr. Lawson Lester telephoned a draftsman requesting the preparation of such drawings. This draftsman told Lester that he had the necessary specification from which such drawings could be prepared. The draftsman did not have the specification 265B but rather he had 265A which was an earlier specification which had been superseded by 265B in 1949. Drawings were prepared from the wrong specification, and fabrication of the component parts for the executive type desk began.
14. The plaintiff misread the specification concerning the typewriter platform mechanism and concluded that the con *551 tract specification, would permit the use of a mechanism which would have the typewriter platform in the normal horizontal position for use by the typist, but when the typewriter was closed within the pedestal, and the door of the compartment closed, the typewriter, bolted to the platform, was suspended vertically on the door. Such an arrangement would seem to require a heavier than usual door hinge, though no heavier than usual hinge was specified. The plaintiff ordered hardware for the secretarial desks which was delivered to its plant and thereafter found not to be usable under the contract specification. When this was called to Lester’s attention, he ordered the correct type of hardware for the secretarial mechanism and it was delivered, though not in time to deliver any of the secretarial desks according to the contract delivery dates. The first secretarial desk was shipped from the plaintiff’s plant on June 14, 1951.
15. The first Government inspector, Mr. Walter C. Jamer-son arrived at plaintiff’s plant on February 13,1951. Prior to that time, Lester had gone to Chicago and presented shop drawings to the contracting officer.
16. On January 23, 1951 the contracting officer wrote the following letter to the plaintiff with reference to contract DA-11-009 QM 4133 (4988-GS-51):
This is to advise that copies of your four shop drawings presented to this office by your Mr. Lester has [sic] been reviewed and it is readily observed that dimension details as set forth in Figures 1, 2 and 3 of Specification 265B for Desks, were not adhered to. For example, your drawings show height from floor to bottom of pedestal 8% inches. Our drawing shows 7 inches. You show a height from floor to bottom of center drawer of 261/4 inches. Our drawing shows 24% inches. Your drawing shows width of drawers in Type I desk as 13% inches. Our drawing shows 13 inches, etc., etc., and your drawing does not detail the drawer fronts in the style shown in Figures 1, 2 and 3 which must be adhered to. Further, your drawing references brass ferrules on bottom of legs, whereas the specification calls for foot sockets with closed bottom.
It is also advised that all drawer runs must be housed into legs and posts and drawer runs in each pedestal must be provided with outlets for telephone wires as required by Par. 3.2.3.8.
*552 Typewriter compartment, typewriter platform and mechanism must conform to requirements of Par. 3.2.5.2, 3.2.5.3 and 3.2.5.4 of the specification. Use of the compartment door for typewriter platform as implied in your shop drawing is not acceptable. One set of your drawings has been marked in red to indicate some of the discrepancies referred to above and your shop drawings are returned herewith with advice that as explained to your Mr. Lester, you are of course privileged to make all shop drawings you find necessary for fabrication of the desks. However, it is not required that this office review and approve your shop drawings, it being the opinion that requirements of the specifications are plain. However, if you should deem it necessary to obtain interpretation of any paragraph of requirements of the specifications, this office will be glad to give you an opinion thereon.
17. On February 13, 1951, the plaintiff had about 500 executive type desks completed which had been manufactured pursuant to the wrong specifications. In addition, component parts for about 4,000 additional desks were in process for assembly into desks. These also had been fabricated pursuant to the wrong specifications.
18. There is no evidence in the record that the plaintiff notified the contracting officer prior to February 13, 1951, that its production had reached the point where desks were ready for inspection by the defendant.
19. It was clear to Mr. Jamerson, the inspector, that such desks as were completed upon his arrival at the plant did not comply with the contract specifications and the plaintiff was so informed by him.
20. The plaintiff took steps to secure an amendment to contract No. 4133 to enable it to utilize the components which had already been fabricated but which did not conform to the specification. Lester went to Chicago where he conferred with a representative of the contracting officer. Apparently he was told to reduce his request to writing. He did this by letter of February 7,1951.
21. Replying to the above-mentioned letter, the contracting officer, by an airmail letter of February 19, 1951, requested clarification of the plaintiff’s request and stated in part as follows:
*553 Due to desk being a critical item urgently required, this office would not be adverse to considering a discount in price on the quantity of desks you have incorrectly cut (that is, with plain drawer fronts in lieu of coved door fronts and the pedestals being 8y2 inches above floor in lieu of 7 inches, etc.), providing the desks otherwise conform to contractual requirements as you bid in competition with other bidders without comment to furnish desks in accordance with requirements of General Services Administration Spec. No. 265B, dated 6 October 1949.
í}í ^ «{• *r«
Attention is invited to the fact that delivery of the desks should have begun in January and to date you have not effected any delivery.
22. On February 14, 1951, Lester told the Government inspector that the delinquency in delivery of desks was due to the changeover from production of civilian goods to the contract work; that it had been necessary to acquire and install some new machinery, and that delay in delivery of hardware also contributed to plaintiff’s delays.
23. By March 9, 1951, the contracting officer authorized certain deviations from the requirements of contract specifications as to 3,894 desks and other deviations from such specifications as to 3,078 desks at a slight reduction in unit price. The plaintiff was notified by letter of that date, with a copy to the inspector, that a formal modification of the contract would follow shortly. The deviations authorized were to enable the plaintiff to utilize parts which had been fabricated according to specification 265A (the wrong specification). Change order No. 1, incorporating the above deviations, was issued on March 16,1951.
24. Between February 13, when the inspector arrived at the plaintiff’s plant, and March 9th or 10th, when the plaintiff and the inspector knew that the deviations referred to above were acceptable to the contracting officer, the 500 desks already completed were occupying much needed space in plaintiff’s plant. Further the plaintiff could not proceed to assemble parts which it knew, when assembled into a completed desk, would not comply with the contract specifications. This caused a delay in the plant. It resulted in the *554 plaintiff selling in the commercial market the 500 desks already completed.
25. The plaintiff now complains of the manner in which inspection was conducted by defendant’s inspector, Walter Jamerson. No written complaint of this sort was made to any representative of the defendant until after the termination for default of both contracts on September 14, 1951, except one note written by Lawson Lester on March 3, 1951 (dated in error 1950), addressed to Mr. Boyer, supervising inspector, as follows:
Mr. Charlie, it seems that our inspector is little technical on the letter of Specifications. He says the way we are applying the finish is OK, but the letter of specifications are not carried out as written, must have OK from your office. We have plant running over with desk so will you please wire us OK collect so we can ship desk.
26. Between May 10, 1951, and May 31, 1951, the plaintiff produced 1,222 desks. These had been assembled in substantial part from components which had been found by Mr. Boyer to have not been in conformity with the specification. Various defects on components had been noted during his visit of May 8. On May 31, when he visited the plaintiff’s plant, the plaintiff 'had between 400 and 500 executive type desks on hand, having sold or otherwise disposed of 700 or 800 desks.
27. On May 31, 1951, Mr. Boyer sent the following report to the Chicago Quartermaster Inspection Division with a copy to the plaintiff’s president:
% 5}i íJí if:
1. Lester Bros., Martinsville, Virginia, the contractor under Contract QM-4133 O.I.-4988-GrS-51 to furnish various type desks and tables, have not offered any of the contract items to the QM Inspectors for acceptance since 10 May. Since that date to the present time, records show that the Contractor has completed approximately 1,222 desks, all of which are an exact duplicate of Contract item a5, Type I, Class I. Between 400 and 500 of these desks are at Lester Bros., plant and I have been given to understand that the balance of the 1,222 have been disposed of through other sources. The components used in the construction or assembly *555 of these desks, some of which were non-specification material(s) as referenced in my letter dated 8 May, being the reason for no QM Inspection.
2. Line assembly and completion of some of Contract item aY, Type II, Class I, Style B typewriter desks was under way this morning and as the QM Inspectors and I viewed them prior to complete finish operation or top affixed, the following defects were apparent:
(a) honeycomb condition still prevalent in posts, and slide
(b) drawer bottoms either too narrow or too short
(c) the grain in two of the exterior surfaces of rear panels runs vertical and the grain in one panel runs horizontal (there are 3 panels)
(d) the tongues (tongue & groove joints) are about Yie" thinner than its corresponding groove
(e) doors of typewriter compartments are warped, in some instances the hinge binds, screw heads project beyond hinge face, screw slots are burred
(f) drawers, especially the center top drawer, too tight
(g) hardener or densifier not being applied to the outside comers of the inside front posts
(h) screw heads into handles, not drawn at least flush with surfaces of drawer or door, heads project and burrs in evidence
(i) poplar strips used in building up the core for desk tops, some are in excess of 4 inch width, (some are over 5" wide)
3. All of the defects noted above were shown to Mr. Lawson Lester and to the plant superintendent, Mr. Bell, for corrective measures. Mr. Lester again has assured me that every effort will be made to produce desks that are in compliance with established requirements.
4. QM Inspector Hughes has been instructed to be of as much assistance to the contractor as possible when called upon and not to perform final inspection until such time as he has been informed that the contract item is then being made to meet all requirements. Then he will start to perform process inspection and to identify by any means he may elect, each desk wherein the construction of it is acceptable. This method of identification will be assurance that only acceptable desks will be included in lots to be then offered for acceptance.
5. An undetermined quantity of these typewriter desks are being processed to completion. All of this type desk include a typewriter platform mechanism, and because of the existing various defe[c]ts none of *556 these desks will be acceptable to the Government. However, if the typewriter platform mechanism was obtained by the contractor through issuance of A DO, the contractor should be immediately notified as to what disposition he can make of these desks.
6. The contractor, Mr. Lawson Lester, is being furnished a copy of this letter.
28. Mr. Jamerson left the plaintiff’s plant about May 30, 1951, on several weeks’ vacation and, at the end of his annual leave, he was assigned other duty, having been replaced in the meantime by a Mr. Wells.
29. On May 12, 1951, plaintiff advised the contracting officer that it had actually subcontracted 3,078 desks each to Welch Furniture Company and Regal Furniture Company. Delivery on both subcontracts was to start on May 28,1951, at the rate of 500 per week. On May 15,1951, plaintiff formally requested such permission and on June 21, 1951, the contracting officer granted permission to subcontract 3,078 desks to Welch. Welch only delivered 409 desks under its subcontract. No desks were delivered by Regal.
30. Welch subsequently sued plaintiff in the United States District Court for the Eastern District of Virginia. The subcontractor alleged breach of the subcontract dated May 11, 1951. Plaintiff’s answer, filed in the District Court action, asserted a counterclaim for damage in the amount of $75,000. The counterclaim alleged that Welch was “constantly behind in its delivery dates to such an extent that [plaintiff Lester Brothers, Inc.’s] contract with the Quartermaster General was cancelled * * * on the 14th day of September 1951, and thus [Lester] could not comply with its contract with the Quartermaster of the Army because of the breach of the contract the plaintiff [Welch] had with the defendant [Lester].” The counterclaim further alleged that because of Welch’s acts “the Quartermaster General * * * has withheld payment under other contracts of a sum of money which it was necessary for the Quartermaster Department to pay to buy desks at a higher price on the market”.
31. On October 3, 1951, the contracting officer sent letters (one as to each contract in suit) demanding payment of *557 excess charges for replacement desks which the contracting officer said had been contracted for at the lowest price.
32. Plaintiff did not object to the earlier partial terminations of the desks effected on June 4, 28, and August 7,1951. Its first objections to termination were directed to the notices of termination issued on September 14, 1951. These objections took the form of two appeals from the contracting officer’s notices of termination dated September 14,1951, to the Under Secretary of the Army, both dated October 11, 1951. In neither of these appeals did plaintiff voice any objection to the manner in which defendant or any of its agents performed inspection on the items manufactured under the contracts. In these appeals plaintiff stated that its default in delivery was excusable for the following reasons:
1. Failure of its subcontractors to furnish necessary supplies.
2. Delay in getting a D.O. rating for steel required in certain mechanisms.
3. Inadequate productive capacity of plaintiff’s veneer-making machinery and, although plaintiff attempted to remedy the situation, delivery of an adequate machine took six months.
4. Lack of precision planing machinery.
5. Inadequate drawer clamp, dovetailing, and other machinery.
6. Delay in getting and installing new machinery.
7. The fact that these were plaintiff’s first contracts with the Army.
33. On September 8, 1952 supplemental findings of fact were transmitted by registered mail to the contractor. These findings were confined to the issues raised by plaintiff’s October 11, 1951, appeals. The contracting officer concluded as follows:
In summation, the undersigned finds that your failure to meet the delivery schedules of your contracts was due to reasons peculiar to your company and within ics control and not due to causes beyond your control without your fault and negligence as contemplated by sub-paragraph (b) of the Default provisions of the contracts.
Since you have heretofore filed Appeals from the Notices of Termination for Default, dated 14 September *558 1951, your appeals will stand as a reply to these Supplemental Findings unless you see fit to file an additional reply or any additional papers or documents.
34. On March 13, 1952, in a supplementary appeal addressed to the Secretary of the Army, plaintiff advised in part as follows:
Even though we were unable to fulfill our contract obligations to the Army in the specified time, we feel that we should at least have an opportunity to have manufactured our limited capacity of the desk for an additional period. Certainly, we should have been allowed to have manufactured desk in the same length of time that other manufacturers were given to fill our contract. From our actual production record the last month we were allowed to produce as follows:
*****
The total of the above desk manufactured for 4 weeks, working a half day on Saturday is 1,507, of this number we were allowed [by] the Contracting Officer to ship 1,121. If the contracting Officer had been so kind as to allow us the privilege of shipping until December 21 or 12 weeks we could have shipped no less than 1,507 every 4 weeks or a total of 4,521. However, as the records will show for the last weeks the men were showing a little improvement, and it is our opinion that we would have been able to have increased manufacturing at least 4% in October over September, 8% in November over September, and 10% in December over September, all making a grand total of 4,853, if allowed to manufacture until December 21,1951, and given just a little extension of time we would have been able to complete contract early in January 1952. The progress noted above is very conservative due to the fact that at the time of the contract termination most all desk parts to complete the contracts were manufactured.
This supplementary appeal also failed to take issue with the manner in which defendant inspected the end items. As far as the record shows, the first time any written objection was made to the inspection process was by letter dated April 16, 1953 addressed to the Armed Services Board of Contract Appeals by plaintiff’s attorneys, in which it was stated:
*559 The contractor also experienced unforeseeable production difficulties because of the conduct of the “on the job” inspectors.
35. During performance of the contracts the plaintiff did not complain of the manner in which inspection was carried out by the defendant, unless the note referred to in finding 25 is so considered.
36. The delays of the plaintiff were not caused by the defendant’s inspectors, except where they found, and properly so, that desks did not conform to contract specifications. Of course, each time a defective desk (and there were many) was pointed out, some delay resulted.
37. The replacement contracts awarded by the Government to procure the desks terminated on September 14,1951, were for the same type of desks originally called for under both of plaintiff’s contracts. The contracting officer awarded the contracts to several replacement contractors, rather than just one, because of the urgent need for the supplies and the short delivery schedule imposed. The plaintiff was also permitted to ship some additional desks after termination in order that the urgent need for desks could be met.
38. About twelve possible sources of wood desks were solicited by the contracting officer for replacements. These sources were selected from known wood desk manufacturers and suppliers who were known to be available for orders at the time. The Government screened its bidders’ lists and only solicited the firms it believed could deliver within the time requirements.
39. On the invitation for bid on which plaintiff’s contract 4133 was awarded, only four manufacturers of wood desks responded out of 612 (wood and/or steel) firms solicited. On contract 5667, of 348 dealers solicited, only four wood desk manufacturers responded. On the replacement contracts of the ten to twelve solicited, seven wood desk manufacturers responded.
40. A formal advertisement was not sent out for the replacement contracts because the urgent need for the desks made the usual 30-day wait from invitation to bid opening impractical.
*560 41. Plaintiff’s appeals from the contracting officer’s terminations and demands for payment of excess costs were determined by the Armed Services Board of Contract Appeals by opinion dated April 30, 1954. The opinion of that board concluded that the termination was proper and further that:
We conclude that the assessment of excess costs was proper and that there was no failure on the part of the government to minimize the damages.
42. No arbitrary action has been shown by the plaintiff with regard to the terminations of the two contracts, nor in connection with the award of replacement contracts.
CONCLUSION OE LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is not entitled to recover, and its petition is therefore dismissed.