**INTERNATIONAL ENGINEERING COMPANY, a Division of A–T–O, Inc., Plaintiff,**

v.

**Elliot L. RICHARDSON et al., Defendants.**

Civ. A. No. 927–73.

United States District Court, District of Columbia.

Oct. 24, 1973.

vom Baur, Coburn, Simmons & Turtle by Robert H. Turtle, James M. McHale, Washington, D. C., for plaintiff.

Leonard W. Belter, Robert M. Werdig, Jr., Asst. U. S. Attys., for defendants.

I. The Court reserves for future consideration Plaintiff's Complaint for Declaratory Judgment. The Court decides this Motion for Preliminary Injunction on the pleadings

## MEMORANDUM OPINION

CHARLES R. RICHEY, District Judge.

Once again this case is before this Court on a Motion for a Preliminary Injunction filed by Plaintiff International Engineering Company (IEC).[1] In order to understand the reasons advanced by Plaintiff in support of its Motion, and the Court's reasons for granting thereof, a review of the history of this case will be helpful. The Court will summarize only briefly the history prior to its earlier decision. See International Engineering Company v. Elliot L. Richardson, et al., 361 F.Supp. 818, D.D.C.1973.

## I. HISTORY OF THE CASE

In late 1967, IEC conceived a system for guiding bombs or missiles with what is referred to by the parties as a LORAN C/D system. In February 1968, IEC submitted an unsolicited proposal to the Air Force that detailed the processes and the performance characteristics of the components as IEC had developed them at the time. This proposal, submitted with a restrictive legend that limited its distribution to Air Force personnel, resulted in the Government's award of a contract to IEC that called for Plaintiff to design and construct a "helicopter flyable breadboard LORAN Missile Guidance Subsystem." (See Plaintiff's Exhibit D, Defendant's Exhibit D). The system was to be constructed and furnished by IEC for the purposes of demonstration but was to remain the property of IEC; the information resulting from demonstration of the system was to be provided to the Government as set forth at Paragraph (b)4 of T–119 incorporated by reference into the DD1423 Test Report as follows:

"(4) Description of test articles, including test configuration identification and photographs as appropriate." Defendant's Exhibit E.

and briefs of counsel for the parties and upon able oral argument heard in open court on July 31, 1973.

The contract provision central to the instant dispute is the Rights in Technical Data clause, an Armed Services Procurement Regulation (7–104.9) incorporated by reference into the contract. Paragraph (b) of the Regulation provides in pertinent part that:

"(1) The Government shall have unlimited rights in:

"(i) technical data resulting directly from performance of experimental, developmental or research work which was specified as an element of performance in this or any other Government contract or subcontract;

. . . .

"(ii) technical data necessary to enable manufacture of end-items, components and modifications, or to enable the performance of processes, when the end-items, components, modifications or processes have been, or are being developed under this or any other Government contract or subcontract in which experimental, developmental or research work is, or was specified as an element of contract performance, *except technical data pertaining to items, components or processes developed at private expense*." (emphasis added).

"(iv) technical data pertaining to end-items, components or processes which was prepared for the purpose of identifying sources, size, configuration, *mating and attachment characteristics, functional characteristics and performance requirements* ("form, fit and function" data, e. g., specification control drawings, catalog sheets, envelope drawings, etc.);" (emphasis added).

"(2) The government shall have limited rights in:

"(ii) technical data pertaining to items, components or processes developed at private expense, other than such data as may be included in the data referred to in (b)(1)(i), (iii),

(iv), (v), and (vi); *provided* that each piece of data to which limited rights are to be asserted pursuant to (2)(i) and (ii) with the following legend in which is inserted the number of the prime contract under which the technical data is to be delivered and the name of the contractor or subcontractor by whom the technical data was furnished . . ."[2]

Paragraph (d) of the same regulation provides for the removal of unauthorized legends marked on data which the contractor delivers to the Government. The contract interpretation problem confronting the Court turns on the meaning attached to the term "substantiate" as it appears in paragraph (d) which is set forth as follows:

"(d) Removal of Unauthorized Markings. Notwithstanding any provisions of the contract concerning inspection and acceptance, the Government may modify, remove, obliterate or ignore any marking not authorized by the terms of this contract on any technical data furnished hereunder if—

"(i) the contractor fails to respond within sixty days to a written inquiry by the Government concerning the propriety of the use of the marking, or

"(ii) the Contractor's response fails to *substantiate* his contention that the use of the marking is authorized, in which case the Government shall give written notice to the Contractor." (emphasis added)

During the time frame for constructing the "Breadboard system" called for in the contract, January 1968 through June 1970, IEC developed an advanced circuitry LORAN C/D Navigation System, at what it alleges to be substantial private expense. As will be discussed in greater detail below, the Government disagrees on the material fact of whose money paid for the development of the Navigation System and argues that the system was developed through Govern-

**2.** The legend as set forth in ASPR 7–104.9 appears in the full text of the regulation:

7–104.9 Rights in Data, attached as Appendix I to this Opinion.

ment funding of the contract.[3] The Government's position on the question of funding was made known *after* the original contract had been modified twice to incorporate the Navigation System into other parts of a LORAN guided bomb and to run simulated tests on a computer, and *after* IEC had submitted several technical reports which contained a detailed description of the internal operations in terms of mathematical and logic diagrams of IEC's precontract components that the Air Force Project Engineer, Mr. Rustenberg, requested in the belief that the information would be helpful to the Air Force in evaluating the test results. (See Contracting Officer's Statement of Reasons for Decision of 2 October 1972; Rustenberg Deposition, pages 29, 34–36). Between October 1970 and November 1970 IEC submitted technical reports which contained "limited rights" legends intended to prevent the release of components' specifications to IEC's competitors. The Air Force never challenged the restrictive legend on the first report, 71–05. However, the first Contracting Officer assigned to the IEC contract questioned the appropriateness of restrictive markings placed by IEC on the second Technical Report, 70–06–4, on the grounds that the restrictive legend was of the kind used for proposals and not contract reports. IEC offered to delete the material altogether and simply comply with the limited requirements of the contract. IEC also submitted an amended proprietary legend. In July 1971 the Contracting Officer decided to accept the amended markings without further question for the following reason:

> "the issuance of P0006 (a contract modification) directing a continuation of the effort initiated under P0003 (an earlier contract modification) constituted a tacit acceptance by the Government." (Exhibit 1 to Harsfield deposition).

In so deciding, the Contracting Officer chose to reject the request of the Contract Engineer, Mr. Rustenberg, that the restrictive legend be ruled improper under the terms of the contract. It is noteworthy that Mr. Rustenberg as early as March 1971 requested the proprietary data to facilitate the Air Force's evaluation of the test results. (Rustenberg Deposition, page 29).

Sometime before the submission of the third report, a new Contracting Officer, Mr. Harsfield, began work on the contract. Mr. Rustenberg served as technical advisor to the new Contracting Officer and on his behalf reviewed the third report. (Rustenberg Deposition, page 31). That report was accepted as submitted without immediate objection.

It was in October and December 1971 respectively that the third technical report and the final report on the original contract and all modifications were submitted and, like the earlier reports, they contained the detailed descriptions of the components requested by Mr. Rustenberg and bore proprietary legends. At the end of December 1971 and almost nine months later in June 1972, the Contracting Officer sent letters to IEC recommending that IEC remove the proprietary markings or furnish substantiation to the contrary. IEC replied January 5, 1972 to the Contracting Officer's December 1971 correspondence but received no further response from the Government until a letter was received June 5, 1972, wherein the Contracting Officer stated that the IEC submission "fails to justify the use of their legend or show that any restriction is authorized." (See Plaintiff's Exhibit M). He further noted that the reports would be used with unlimited rights. IEC obtained an agreement on the part of the Air Force not to release the reports pending a meeting "to discuss the proprietary rights question." This meeting occurred June 26, 1972 and was conducted by Mr. Harsfield. During the course

---

3. The Court makes no finding as to this controverted and material fact. However, it is the Court's preliminary opinion that Plain-
tiff did develop the system at private expense, and this Opinion supports the likelihood of Plaintiff's success on the merits.

of the meeting, IEC submitted a three-page outline and made a two hour oral presentation which was deemed vague by the Contracting Officer who requested additional substantiation. At no time during the meeting did Mr. Harsfield question the IEC position. (Harsfield Deposition, pp. 76–77). Shortly thereafter, the Contracting Officer executed a final acceptance on the contract and final payment was made by the Air Force at the end of September 1972. The Contracting Officer received no further efforts at substantiation by IEC and, by letter dated October 2, 1972, informed the Contractor that the reports would be used by the Government with unlimited rights.

During January 1973 the Contracting Officer's decision was reviewed by personnel of the Headquarters, Air Force Systems Command, and of the Chief of Staff, United States Air Force and, later, by the Assistant General Counsel for the Air Force who requested that IEC submit further written material and that the Contracting Officer consider it. This material was submitted in IEC's letter dated February 8, 1973 and failed to change the opinion of the Contracting Officer.

Plaintiff then brought this action to enjoin the Secretary of the Air Force from releasing the reports. In particular, IEC contended that it had met the burden of substantiating its proprietary claim as it interpreted the import of the term "substantiate." Plaintiff further argued that the Contracting Officer's failure to provide reasons for not agreeing with IEC's proprietary claim made it impossible to inveigh against his decision once further submissions were sought. Defendant responded by challenging the jurisdiction of the Court.

In consideration of Plaintiff's Motion for Preliminary Injunction and Defendant's Motion to Dismiss, the Court was confronted with close questions concerning the application of sovereign immunity and permissible review under the Administrative Procedure Act, 5 U.S.C. § 701 et seq. (1970). The Court's analysis led it to the conclusion that the APA provided a basis for subject matter jurisdiction and served as a waiver of sovereign immunity. Before turning to the question of the preliminary injunction, however, the Court determined that a statement of reasons by the Contracting Officer was essential to effective judicial review. Therefore the Court denied Defendant's Motion and took under advisement Plaintiff's Motion together with the contract terms and IEC's description of the Contracting Officer's actions upon which that motion was based. Rather than step blindly, and therefore dangerously, into a procurement operation foreign to the judicial process of conflict resolution, the Court remanded the case to the Contracting Officer for an explanation of his actions sufficient to permit the Court to proceed with its unique review of the contract dispute at bar. As an interim measure the Court requested and the Government agreed not to release the alleged proprietary data until the Court could review the Contracting Officer's statement of reasons and Plaintiff's response thereto and rule on Plaintiff's Motion for a Preliminary Injunction.

The Court attempted through its Opinion and Order of July 10, 1973 to obtain the information necessary for effectively resolving what the Court perceived as, in essence, a familiar judicial problem of contract interpretation, but a problem uniquely situated in the Federal procurement field. In light of the information received pursuant to the Court's Order, the Court has had sufficient opportunity to probe the interrelated ASPR provisions, the contract terms and the positions of the parties to the extent that the Court believes Plaintiff's Motion for a Preliminary Injunction should be granted.

## II. THE DECISION HEREIN TO GRANT JUDICIAL RELIEF IS WITHIN THE COURT'S DISCRETION AND IS APPROPRIATE WHERE A CONTRACTING OFFICER ABUSES HIS REGULATORY AUTHORITY

■ In view of the extraordinary relief the Court grants Plaintiff in its Order issued of even date with this Memorandum Opinion, it is necessary to air the Court's thoughts regarding the appropriateness of the action taken herein. Judicial forays into the procurement process are regarded with skepticism in this Circuit due in large part to the complexity of the rules and regulations governing procurement and the expertise required for efficient administration of the procurement process within the regulatory web. See M. Steinthal & Co. v. Seamans, 147 U.S.App.D.C. 221, 455 F. 2d 1289 (1971). Our Court of Appeals in past decisions has highlighted the public interest in fairness and compliance with regulations in lawsuits brought by disappointed bidders on government contract, only to ultimately decide that this interest is outweighed by the public interest in efficient operation of government. See A. G. Schoonmaker Co. v. Resor, 144 U.S.App.D.C. 250, 445 F.2d 726; M. Steinthal & Co. v. Seamans, *supra.* The Court of Appeal's concern in these cases with the inefficiencies that obtain from extensive review of contract awards prompted its determination that the District Courts should refuse to review appeals from contract awards where the highly subjective decision of a contracting officer who relied on specialized technical knowledge is in question. In light of this concern, the District of Columbia Circuit and the Fifth Circuit have held that where an agency or official other than the contracting officer reviews the latter's decision, courts will defer to administrative expertise. For example, see Allen M. Campbell Co. v. Lloyd Wood

Construction Co., 446 F.2d 261 (5th Cir. 1971); A. G. Schoonmaker Co. v. Resor, *supra;* M. Steinthal & Co. v. Seamans, *supra.*

As the above cases and other procurement cases like them reflect courts' efforts to balance the competing interests that favor or oppose review, so does the history of this case demonstrate this Court's careful attempts to identify and balance the competing interests. That weighing of interests has led the Court to the opinion that the public interest, as well as Plaintiff's, is best served by granting Plaintiff the injunctive relief it seeks.

■ In deciding to review IEC's claim under the Administrative Procedure Act, *supra,* the Court relied on the landmark decision by the United States Court of Appeals in Scanwell Laboratories, Inc. v. Shaffer, 137 U.S.App.D.C. 371, 424 F.2d 859 (1970). In *Scanwell,* the Court of Appeals held that disappointed bidders for government contracts have standing under the A.P.A., 5 U.S.C. § 701(a)(2) (1970), to bring suit for declaratory and injunctive relief in order to determine the validity of the agency's actions. Although *Scanwell* involved disappointed bidders whose legal rights when denied a contract were somewhat unclear and the instant case concerns a party under contract with the government and possessing definite contractual rights, it is the Court's opinion in the setting of this case that review should be made available to both "potential sellers and those already under government contract," [4] and that an appropriate remedy should be made available "to correct [governmental] overreaching." [5] Like the Court of Appeals' decision in *Scanwell* to abandon the traditional refusal of courts to intervene in the procurement process, the Court's decision to intervene here is supported by two interests: first, the interest in IEC as an individual allegedly harmed by illegal, arbitrary and capri-

---

4. Levanthal, "Public Contracts and Administrative Law," 52 ABAJ 35, 38 (1966).

5. *Id.*

cious action by the contracting officer; and second, the interest of the public, represented by IEC as a "private attorney general," in having government contracts administered fairly and according to the regulations. Only if contractors are assured fair and equitable treatment by contracting officers can the long-term integrity, economic welfare and efficiency of the procurement process be advanced.

■■ Thus the Court regards this suit as one brought, in part, in the public interest to prevent arbitrary or capricious decision-making in the administration of government contracts and, particularly, *to restore the role of the contracting officer to one who tests evidence by procedures sufficiently adversary in nature to provide a reasonable guarantee of its reliability.* See Scanwell Laboratories, Inc. v. Shaffer, *supra;* Mobil Oil Corporation v. Federal Power Commission, D.C.Cir., 483 F.2d 1238, 1973. It is no longer reasonable for courts to take the position that regulations governing contracting are for the protection of the government and the public and not for the protection of those who bid for and perhaps obtain contracts with government.[6] The public interest cannot turn solely on efficient procurement, but has to fasten on the fairness and integrity along with the efficiency of the procurement process which at this point in this country's history accounts for payments amounting to more than one-half of all federal expenditures.[7] Negotiated contracts like IEC's provide more than half the dollar value of all federal procurements[8] and upwards of 85% of the dollar value of

military procurements.[9] In view of the mushrooming economic development of the procurement process, the Court has determined that the public interest would be best served by a limited and expedited review of the government's administration of the IEC contract, notwithstanding the delay in the completion of the government's feasibility studies in this defense area. The government has noted in its submissions to the Court that IEC's components are technologically undesirable and have no practical value to the government aside from providing future government contractors with a blueprint of what *not* to do. In light of the purpose to which the government intends to put the data in question, the Court is of the opinion that review of this suit in no way delays procurement for the national defense.[10] For the aforementioned reasons, the Court believes this case "calls for an assertion of an overriding public interest 'in having agencies follow the regulations which control government contracting.' " M. Steinthal & Co. v. Seamans, *supra,* 147 U.S.App.D.C. 221, 455 F.2d 1289, quoting Scanwell Laboratories v. Shaffer, *supra,* 424 F.2d at 864.

■■ It is within this Court's discretion to refuse to entertain a suit for injunctive relief in light of the potentiality of a damages remedy in the Court of Claims. M. Steinthal & Co. v. Seamans, *supra.* However, the Court doubts both the likelihood and adequacy of a damages remedy in the Court of Claims. An effective remedy in damages arguably would be IEC's lost profits from unauthorized disclosure of its trade secrets. See Uniform Commercial

---

6. See "Governmental Contract Bid Protests: Judicial Review and The Role of the Court of Claims," 39 Chicago Law Review 84 (1973).

7. U. S. Department of Commerce, Statistical Abstract of the United States 374, table 574 (1970).

8. See "Government Contract Bid Protests," *supra,* 39 Chicago Law Review at 816, footnote 10, where the author refers to the Subcommittee on Federal Procurement and Regulation of the Joint Economic Committee,

89th Congress, 1st Sess., Background Material on Economic Impact of Federal Procurement 21 (1966).

9. *Id.*

10. Therefore, the Court has decided that those bidder suits where Courts have refused to delay national defense procurement are not controlling. See A. G. Schoomaker Co. v. Resor, *supra,* City Chemical Corp. v. Shreffler, 333 F.Supp. 46 (S.D.N.Y.1971); American Standard, Inc. v. Laird, 326 F.Supp. 492 (D.D.C.1971).

Code § 2–708(2) (1972 edition). However, there are few satisfactory methods to measuring the value of losses resulting from the unauthorized disclosure of trade secrets. See Precision Plating & Metal Finishing, Inc. v. Martin-Marietta Corp., 435 F.2d 1262 (5th Cir. 1970); Appeal of Joanell Laboratories, Inc., 72–1 BCA par. 9218. Especially where the only potential buyer of products related to IEC's trade secrets refuses to recognize any practical value in the goods themselves. Most importantly, however, the Court is convinced that irreparable injury would result from the unauthorized disclosure of IEC's trade secrets. Therefore, it is not significant whether or not plaintiff could avail itself of damages to some amount not measured by anticipated profits through successful adjudication of its rights in the Court of Claims. It seems more important that IEC be able to obtain the injunctive relief which the strength of its claim merits, but which the Court of Claims cannot provide. See United States v. King, 395 U.S. 1, 89 S.Ct. 1501, 23 L. Ed.2d 52 (1969). The Court's decision to proceed with its review of Plaintiff's motion for a preliminary injunction in light of the recent submissions to the Court by the parties in this case, particularly the statement of reasons provided by the contracting officer and his deposition, is within its discretion and consistent with the viewpoint expressed by the Court of Appeals in M. Steinthal & Co. v. Seamans, *supra,* where Judge Leventhal suggested the appropriateness of intervention by the District Court in certain circumstances:

> "To avoid any confusion, it is not being stated here that the damages available to the disappointed bidder, which do not comprehend anticipated profit, are automatically an 'adequate' legal remedy as to warrant dismissal for want of equity of every injunction action regardless of the strength of plaintiff's claim on the merits." 455 F.2d at 1302 (1970).

## III. THE SCOPE OF REVIEW AND THE NATURE OF RELIEF GRANTED

■ The absence of case law regarding the appropriate standard of review in a procurement dispute like the case at bar presents the Court with two alternatives: (1) apply the most appropirate Administrative Procedure Act standard of review; or (2) evaluate the merits of the case in accordance with settled principles of contract law. See United States v. Little Lake Misere Land Co., Inc., 412 U.S. 580, 93 S.Ct. 2389, 37 L. Ed.2d 187 (decided June 18, 1973). At this stage in the litigation the Court need not decide the merits. However, the appropriate standard of review takes on significance in its limited application within the judicial guidelines for issuing preliminary injunctive relief. The standards for granting preliminary equitable relief are set out in Virginia Petroleum Jobbers Assn. v. FPC, 104 U.S. App.D.C. 106, 259 F.2d 921, 925 (1958). Among those standards is the requirement that there be a likelihood of plaintiff's success on the merits. (See page 651 infra). In order to best apply the criteria set forth in *Virginia Jobbers,* the Court shall undertake to evaluate the merits of IEC's claims under the appropriate APA standard as well as under accepted contract law principles.

Although this Court relied on the decision in *Scanwell* and the controlling interests identified therein in deciding the appropriateness of review in the case at bar, the Court is unable to glean from *Scanwell* a clear articulation of the scope of review appropriate to the case at bar. Therefore the Court looks initially to the Administrative Procedure Act for standards applicable to the review of the instant complaint which challenges the Contract Officer's contract interpretations and the actions he has taken in response to those interpretations. Fortunately, the Act provides standards that are applicable to the instant dispute.[11]

---

11. Quite obviously in deciding to review this case and in determining that particular APA standards are applicable, the Court makes clear its position that in no fashion can a

The review section of the APA insulates certain agency actions from review "to the extent that (1) statutes preclude judicial review; or (2) agency action is committed to agency discretion by law." 5 U.S.C. § 701 (1970). However, the interpretation given § 701 in this Circuit provides this Court with a good deal of latitude in determining the extent to which a statute or regulation operates to make a discretionary decision unreviewable, particularly where, as here, a procurement regulation authorizes a discretionary determination by the contracting officer. See Wheelabrator Corp. v. Chafee, 147 U.S.App.D.C. 238, 455 F.2d 1306, 1311–1312 (1971); Blackhawk Heating & Plumbing Co. v. Driver, 140 U.S.App.D.C. 31, 433 F.2d 1137 (1970).

■ Several procurement cases in which courts have treated questions of governmental overreaching find their genesis in circumstances where the government accepts one bid over another or decides to cancel a contract. In both situations the contracting officer, or the Secretary of the instant agency depending upon the particular setting, takes action pursuant to an express statutory mandate. See M. Steinthal and Co. v. Seamans, *supra*; Udall v. Littell, 125 U.S.App.D.C. 89, 366 F.2d 668 (1966); Littell v. Morton, 445 F.2d 1207 (4 Cir., 1971). The approach of the courts in those cases is apposite to the instant dispute involving the exercise of administrative discretion pursuant to an Armed Services Procurement Regulation incorporated by reference into the IEC contract. Without question the relevant regulation, ASPR 7–104.9, commits the interpretation of the Technical Rights in Data Clause to the contracting officer. (See Appendix). With respect to his interpretation, therefore, the Court may *not directly review its legal propriety.* The Act commands that courts refrain from such review where legal interpretation is entrusted to the agency, 5 U.S.C. § 701. However, the Act expressly pro-

vides that the courts "shall . . . hold unlawful, . . . agency actions, findings and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Under this provision, the Court must undertake a limited review of the contracting officer's *decisions* rendered pursuant to the Rights in Data clause to determine whether it is likely that he acted arbitrarily and without a rational basis. Udall v. Littell, *supra*; M. Steinthal & Co. v. Seamans, *supra*.

■ The above background is important to an understanding of the issues related to the Court's decision to issue a preliminary injunction, particularly the issue whether there is a likelihood that IEC will prevail on the merits. That issue along with several others is determinative of plaintiff's motion for a preliminary injunction. In Virginia Petroleum Jobbers Assoc. v. FPC, 104 U.S.App.D.C. 106, 259 F.2d 921 (1958), the United States Court of Appeals for the District of Columbia Circuit set forth four criteria to consider in deciding whether to issue a preliminary injunction. They are as follows:

(a) That the petitioner has a strong likelihood of prevailing upon the merits;

(b) That the petitioner would be irreparably injured without such relief;

(c) That the stay or injunction would not substantially harm other interested persons;

(d) That the public interest will not be significantly harmed.

■ In addition to these four criteria governing the issuance of a preliminary injunction, the Court's consideration of the government contractor's claim should draw upon two interrelated principles articulated by Judge Leventhal in M. Steinthal & Co. v. Seamans, *supra,* which apply where determinations

---

government contract shelter a contracting officer, who at all times is an agent of the

government, from some standard of accountability under the APA.

of procurement officials are before the Court:

"(1) courts should not overturn any procurement determination unless the aggrieved bidder demonstrates that there was no rational basis for the agency's decision; and (2) even in instances where such a determination is made, there is room for sound judicial discretion, in the presence of overriding public interest considerations, to refuse to entertain declaratory or injunctive actions in a pre-procurement context." 455 F.2d at 1301.

The government contends that the *Steinthal* principles severely limit this Court's choice to apply the public interest values of *Scanwell* to the facts of the case at bar. The Court respectfully disagrees. The instant dispute is clearly one of the "meritorious sheep" as described by the Court of Appeals in *Scanwell, supra,* 424 F.2d at 872. After a careful examination of the IEC contract and the extensive memoranda, affidavits and depositions filed in this law suit, it is the Court's conclusion that the contracting officer and his organization or staff violated the statutory boundaries set by ASPR 7–104.9, and that the contracting officer in an arbitrary and cavalier manner arrived at a determination which is not reasonable.

## A. PLAINTIFF HAS A LIKELIHOOD OF SUCCESS ON THE MERITS

IEC is before the Court seeking equitable relief in a stringent form against government action. In these circumstances IEC's burden is heavy indeed and the Court must restrict its inquiry to a determination of whether the decisions of the contracting officer had a reasonable basis, or appear to have had a reasonable basis for purposes of IEC's motion. The lessons taught by the bidder suits instruct the Court to "fully take into account the discretion that is typically accorded officials in the procurement agencies by statutes and regulations." M. Steinthal & Co. v. Seamans, *supra,* 455 F.2d at 1301. In

Wheelabrator Corp. v. Chaffee, 147 U.S. App.D.C. 238, 455 F.2d 1306 (1971) the Court of Appeals further commented:

"In view of the public interest in expeditious procurement a preliminary injunction cannot be justified unless the court makes a considered judgment of a probability of success on the merits. Likelihood of success is a requirement of an injunction even though the court's probing and analysis may not be as comprehensive when its injunction is limited to the period required for a determination by the GAO on the protest." 455 F.2d at 1317.

The Court has given the closest consideration to the facts presented and determined that IEC has sufficiently demonstrated its probability of success on the merits. It is clear to the Court that the contracting officer's process of decision-making in this instance was contrary to the ASPR requirements that contracting officials make a meaningful inquiry and good faith effort in the exercise of their discretion. Consequently, it was no accident that the contracting officer's final decision to obliterate the restrictive legend on three IEC Reports and authorize the use of all the reports with unlimited rights was unsupported by evidence and reflected legal conclusions that appear incorrect as a matter of law.

The integrity of the procurement process turns on the responsiveness of contracting officials to follow the regulations in a manner that insures free and fair competition. See A. G. Schoonmaker v. Resor, 144 U.S.App.D.C. 250, 445 F.2d 726 (1971). In the area of advertised bid procedures, for example, the contracting officer's discretion is canalized through a regulatory structure setting forth the criteria he should consider and the procedures he must follow in awarding a contract. See 32 C.F.R. § 1.300–2 (1972); 41 C.F.R. §§ 1–1.301–2, 1–2.102(a). Since the contracting officer's decisions as to whether a bidder is "responsive" to a bid invitation or "responsible" to the extent that he can be

expected to satisfactorily perform the contract require the contracting officer to make subjective judgments, courts demand high standards of performance within the regulatory guidelines to prevent against fraudulent or collusive contract awards. See Wheelabrator Corp. v. Chafee, *supra*. It is the Court's opinion that the degree of care with which a contracting officer awards a contract should presage the exactitude with which he and other contracting officials issue decisions during the course of the contract's administration.

1. *The Decision of the Contracting Officer to Strike Plaintiff's Restrictive Legend Is Illegal Since It Did Not Comport With the Minimal Due Process Requirements of ASPR 7–104.9(d).*

The Court's concern here is with the contracting officer's decision that IEC failed to "substantiate" or "show" the propriety of the use of a limited rights legend on the data it submitted in connection with reports 70–06–04, 70–07 and 70–09. The Air Force is prevented from removing such legends or treating the data in issue with "unlimited rights" until the contracting officer determines that the contractor has failed to "substantiate his contention that the use of the marking is authorized" and the officer provides "written notice" of such determination to the contractor. It is clear to the Court that the contracting officer never reached an independent decision with respect to IEC's efforts to substantiate the use of the restrictive legend and therefore never made available to plaintiff a meaningful notification of his decision that comported with the requirements of procedural due process such that plaintiff could adequately challenge the decision either in its dealings with the contracting officer or in an appeal to the Secretary of the Air Force.

▆ In the case at bar, Contracting Officer Harsfield, the second of the two contracting officers on the IEC contract, appears to have relied entirely on his advisors, particularly Mr. Rustenberg, with the result that Mr. Harsfield's decision was not made on the basis of the evidence before him but on the untested opinion of his advisors. (See Harsfield Deposition, pp. 76–77, 118–119; Rustenberg Deposition, pp. 63–65). Most importantly, that opinion was not provided to IEC as required by the notification requirement of the ASPR in issue. Insofar as the Contracting Officer relied on Mr. Rustenberg's definition of "function" as it appears in paragraph (b)(1)(iv) of the Rights in Technical Data clause of the contract to determine that IEC had failed to substantiate its right to place a restrictive legend on the data, Mr. Harsfield's decision was unreasonable and unsupported by the record before him. It does not appear to the Court that a determination of what comes within the term "form, fit and function" enjoys a breadth of discretion drawing on technical expertise. Rather, the Contracting Officer's range of interpretations was limited by the Schedule of the Contract which provides an understanding of the nature of the data for which the Government contracted. In reviewing the items specified for inclusion in the Final Test Reports, it is apparent to the Court that the plain meaning of items described excludes without question an integral design of the IEC system. The Schedule of the Contract makes reference to an attached DD Form 1423 that discussed the data IEC was required to deliver. The pertinent part of that form is Data Item A002, Test Reports Development, which explains the applicability of Data Item description T–119 which, in turn, specifies items to be included in the Final Test Reports. With respect to IEC's hardware used in the test, that is, IEC's processes and components themselves, T–119 calls for data as follows:

"Description of Test Article, including test configuration identification and photographs as appropriate."

The description of the "test article" is defined under the heading Description

of Test Apparatus found in Mil–Std–831 (Defendants' Exhibit F) :

"5.6.10.1.1. Description of test apparatus. A description of test apparatus shall include a tabulation of all instruments and equipment used, the manufacturers' names, serial numbers, raises, accuracy, and dates of latest calibration."

Thus IEC was expected to identify the components of the system it was testing but under no reading of the above could IEC be required to describe the internal operations, the mathematical equations and logic diagrams, of the test hardware. Yet that was Mr. Rustenberg's conception of the data requirements as adopted by the Contracting Officer.

The Contracting Officer's letters of December 28, 1971, June 5, 1972 or October 2, 1972 suggested to IEC, that plaintiff had not substantiated its right to mark the reports with restrictive legends. Therefore, IEC chose to respond to each of those letters with a further attempt to establish by the existence of competent evidence that IEC developed the LOMISS processes and components at its own expense prior to the inception of the contract. It seems that the reasonableness of Plaintiffs' efforts to convince the contracting officer of the rightness of its position was negated by failure of the Contracting Officer or his aides to reveal their conviction that IEC was required to deliver the data in which it asserted proprietary rights, in part, because of opinions such as the following: "significant testing of Unit B occurred under Contract Modifications P0003 and P0006, and . . . the precontract flight testing were only demonstrations intended to obtain funding for significant and necessary testing." (Statement of Reasons for Contracting Officer's Decision of 2 October 1972, page 5). This speculation on the part of the Contracting Officer is based on Mr. Rustenberg's impression that the testing of one IEC system, "Unit B", before the contract Modification P0003 was awarded, was not successful and only reached a satisfactory level of performance during subsequent tests that in part were accomplished at government expense. This theory of Mr. Rustenberg has been adopted by the Contracting Officer though there has never been a factual underpinning provided. Furthermore, this opinion was never suggested to Plaintiff so that IEC might test it in an adversary manner which the Court believes appropriate.

The theory of Mr. Rustenberg appears to the Court to have been the overriding basis of the Contracting Officer's final decision on October 2, 1972. Yet Mr. Rustenberg's theory had no foundation in facts gathered in the course of IEC's efforts to substantiate its claims. Indeed, IEC was never advised that its efforts to demonstrate the development of its processes and components at private expense were futile in that the data in question was considered by the Contracting Officer to be the product of federally funded testing, which would preclude that opportunity to place restrictive legends on data submitted pursuant to the contract.

Where the Contracting Officer makes a discretionary determination based upon his reading of the contract and the field reports of his aides, the due process requirements of the ASPR demand at the least that the Contracting Officer independently review any staff opinion he adopts, that he have a factual basis for his subjective reasons, and that he notify the contractor accordingly. Here he had none, and no adequate notice was provided. Instead his subjective analysis began and ended with the unsubstantiated opinion of the contract engineer. The Court must reject this decisional process and the conclusions it generated as unfair, unreasonable, and violative of the minimal due process requirements of ASPR 7–104.9(d).

Thus the Court regards the contracting officer's ultimate decision to strike plaintiff's legend as violative of procedural due process requirements insofar as the instant regulation on its face requires the contracting officer to

reach an independent decision that IEC's restrictive legend "was not permitted by the terms of the contract" and to make the basis for that decision known to IEC. Although the Court does not reach the issue, it is important to note that ASPR 7–104(d) is seriously lacking in adequate standards for striking a restrictive legend and in adequate procedures including notice of specific objections by the contracting officer, opportunity to present evidence and to cross-examine adverse witnesses. In addition, the regulation does not provide for administrative findings and conclusions on the record made before the contracting officer. By requiring a statement of reasons and meaningful compliance with the notification requirement by the contracting officer, the Court in this case, hopefully, has moved the procurement process closer to conformity with due process of law.

However, it is the Court's concern that an ASPR, which purports to authorize a contracting officer to strike a contractor's restrictive legend from data in which the contractor claims a significant property interest, should provide procedures consistent with the requirements of procedural due process under the Fifth Amendment to the United States Constitution. Since the striking of a contractor's restrictive legend for data to which the contractor claims a property interest and the subsequent delivery of the data to the contractor's competitors constitutes an adjudication of the contractor's proprietary interest by the contracting officer, adequate notice and a full hearing would seem appropriate. *See* Bell v. Burson, 402 U.S. 535, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971); Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970); Sniadach v. Family Finance Corp., 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969); Fuentes v. Shevin, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972); Perry v. Sinderman, 408 U.S. 593, 92 S. Ct. 2694, 33 L.Ed.2d 570 (1972); and Board of Regents v. Roth, 408 U.S. 564, 92 S.Ct. 270, 33 L.Ed.2d 548 (1972).

■ Finally, notwithstanding the due process violations by the contracting officer noted above, the Court believes IEC met the regulatory test of substantiation. Although the Court can accept the Government's definition that "substantiate" means "to establish the existence of true or competent evidence", the Court is inclined to agree with IEC that Plaintiff indeed provided competent evidence to the extent that IEC could appreciate what the Contracting Officer was searching for. IEC attempted to document in a written history the development of the processes and components alleged to have been developed at IEC expense. An Independent Audit Report was included. This evidence supported the proposition that IEC incorporated its processes into certain components which existed as identifiable hardware prior to July 1969 and independent of any Government funding. (See Independent Audit Report, Rustenberg Deposition, page 5).

■ The Court is on firm ground in interpreting the import of the term "substantiate" in a different manner from the Contracting Officer, even if such a reading is contrary to the intention of the Government's draftsman:

"If the Government had contracted with either Steinthal or Pioneer and a dispute had arisen over the meaning of the delivery schedule, the court would have been faced with a familiar judicial problem of contractual interpretation; it might decide that, regardless of the intention of the Government's draftsman, the amended IFB gave the contractor a reasonable latitude as to the time of delivery. Such a decision might very well be upheld by this court since it involves the resolution of a contractual ambiguity, and under familiar legal doctrine a court may well construe a provision strictly against the Government draftsman, giving the benefit of any doubt to the private party who did not draft the particular provision." M. Steinthal & Co. v. Seamans, *supra*, 455 F.2d at 1303.

It is the Court's opinion that Plaintiff met the burden of substantiating the propriety of the limited rights legend claim, as IEC understood that burden at the time the contract was made.

2. *The Government Is Estopped from Denying the Propriety of Restrictive Legends Appearing on Final Reports Submitted by IEC Subsequent to the Government's Acceptance of Report 70–06–04.*

 The important question raised by the Contractor here is whether the Government has an unlimited right to use and disclose to others for their use detailed design data relating to IEC processes and components allegedly prepared independent of the contract funding and submitted to the Government independent of any contract requirement but as a cooperative response to the request of the Contract Project Engineer. With respect to the above question, the Court assumes as a threshold matter that the Government obtained rights, either "limited" or "unlimited," only in the technical data which the Government specified was to be delivered under the contract. The Court refers the reader to Section III, page 652, of this Opinion and where the Court concluded that the Air Force did not order detailed design data of any of the components of either of the systems tested under the contract. Accordingly, the Government did not acquire any rights in data submitted by IEC with restrictive markings that was not part of the data ordered in the contract.

 However, the Air Force did obtain possession of the alleged trade secrets as a result of IEC's response to Mr. Rustenberg's request. It is not clear whether the Air Force through Mr. Rustenberg repeated its request for design specifications at the time for submission of each Final Technical Report, however, IEC included the data each time and marked it with restrictive legends. It is the Court's opinion that even in the absence of evidence supporting an express agreement of nondisclosure,

IEC's delivery of the data with restrictive legends supports the existence of an implied understanding that the data was received in confidence. It is well settled that in the presence of an implied agreement the Government is liable for the unauthorized use and disclosure of proprietary data. See Horner v. United States, 86 F.Supp. 132, 114 Ct.Cl. 612; Comp.Dec. B–155885, May 1965.

IEC contends that the restrictive legends demonstrate its intention not to deliver the detailed proprietary data to the Air Force with unlimited rights and that the Air Force had no reason to believe otherwise. Plaintiff's position is supported by IEC's effort to obtain the return of its data by revising and resubmitting the Reports containing the challenged markings. In IEC's letters of June 14, 1971 and January 5, 1972, respectively, IEC explained to the Air Force its offer to revise Report 70–06–04 and made clear its intention to retain a restrictive rights interest in the technical data to which it attached a restrictive rights legend in Reports 70–06–04, 71–07 and 71–09. The Air Force never responded to IEC's June 15, 1971 letter but accepted the Report 70–06–04 and paid for it. As a consequence of the Air Force's failure to respond to that letter and the Air Force's decision to issue a Modification to the Contract, Mod. P0006, IEC concluded that the Air Force regarded the restrictive legend on Report 70–06–04 to be proper. IEC proceeded to submit the same data with the appropriate restrictive legends in the next two reports in reliance on the Air Force's informed acquiescence in Plaintiff's assertions regarding Report 70–06–04. The Court believes Plaintiff's reliance to have been justified in light of the Contracting Officer's position upon accepting the report (See Exhibit 1 to Harsfield Deposition). The Government's actions and Plaintiff's reliance thereon have the effect of legally estopping the Government from claiming that the restrictive rights legends submitted on the Reports filed after acceptance of

70–06–04 are improper.[12] Equitable estoppel prevents the Government's assertion of rights which might have existed had not the Government's conduct rendered it inequitable for this Court to permit the Government to assert these rights against IEC. See Manloading & Management Assoc., Inc. v. United States, Ct.Cl., 461 F.2d 1299 (1972).

### B. PLAINTIFF WOULD BE IRREPARABLY INJURED WITH SUCH RELIEF.

The Court has concluded that IEC will be irreparably injured if the Government releases the technical data containing IEC's LOMISS processes and components to the public. In taking the position that it is entitled to the data marked with restrictive legends, the Government has conceded the information is of a kind that would permit competitors to reproduce, or as the Government desires, stay far away from producing the IEC processes and components in issue. Obviously, the release of such detailed data would destroy any competitive advantage presently held by IEC.

The harm to IEC by public disclosure is found in the irrevocable loss of a competitive advantage and uncompensable economic hardship. The Court balances this with the administrative burden the Government has complained of in its review of proposals as a result of the delay occasioned by this Court's review of the alleged unfairness in the Contracting Officer's decision. The scales weigh decisively in granting Plaintiff the preliminary relief it seeks. Only a cry of "national security" would turn this Court from its purposeful review of the decision-making process in question here. See Horne Brothers, Inc. v. Laird, 150 U.S.App.D.C. 177, 463 F.2d 1268 (1972).

### C. THIS INJUNCTION WILL NOT SUBSTANTIALLY HARM OTHER INTERESTED PERSONS

The Government contends that other defense contractors are restless over the delay in the Government's consideration of their proposals, while it awaits this Court's determination regarding who presently has title to IEC's alleged proprietary data. It is the Court's opinion that defense contractors would experience considerably less anxiety if they were to be assured through the actions of this Court that the Government will not be permitted to act in an arbitrary manner where the protection of their trade secrets hangs in the balance. These contractors must have an extensive interest in the degree to which a contracting official will be permitted to determine that information turned over to government officials in the course of a contract as part of an effort to cooperate with their review of the contractor's work can be released to competitors despite restrictive legends affixed to the information at the time it was submitted.

The interest the Court seeks to safeguard here is central to the welfare of the procurement process as reflected in the Armed Services Regulation set forth below. The Government and the contractors will benefit in the long run from the Court's thorough application of the policy considerations which underlie ASPR 9–202.1, set forth in pertinent part as follows:

"¶ 9–202.1 *Background.*

"(c) *The Balancing of Interests.* It is apparent that there is no necessary correlation between the Government's need for technical data and its contractors' economic interests therein. However, in balancing the Government's requirements for technical data

---

12. The Government argues that acquiescence is legally irrelevant since the Contract Right in Technical Data clause, paragraph (d), provides that the Government's acceptance of data does not preclude the Government from obliterating any marking not authorized by the terms of the contract. The Court views the Government's acquiescence as relevant, indeed, since it resulted in IEC's reasonable reliance. Accordingly, the Government is estopped from asserting the otherwise valid rights set forth in paragraph (d). See 3 Pomeroy, Equity Jurisprudence, § 802 at 180 (5th Ed.1941).

against the contractor's interest in protecting his data, it should be recognized that there may be a considerable identity of interest. This is particularly true in the case of innovative contractors who can best be encouraged to develop at private expense items of military usefulness where their rights in such items are scrupulously protected. It is equally important that the Government foster successful contractual relationships and encourage a ready flow of data essential to Government needs by confining its acquisitions of technical data to cases of actual need. Certainly the Government must not be barred from bargaining and contracting to obtain such technical data as it needs, even though that data may normally not be disclosed in commercial practice. Moreover, when the Government pays for research and development work which produces new knowledge, products or processes, it has an obligation to foster technological progress through wide dissemination of the new and useful information derived from such work and where practicable to provide competitive opportunities for supplying the new products and utilizing the new processes. At the same time, acquiring, maintaining, storing, retrieving, and distributing technical data in the vast quantities generated by modern technology is costly and burdensome for the Government. For this reason alone, it would be necessary to control closely the extent and nature of data procurement. Such control is also necessary to insure Government respect for its contractors' economic interest in technical data relating to their privately developed items. The policies and procedures of this Part are framed in the light of these considerations."

## D. PUBLIC INTEREST WILL BE SERVED.

The Court's comment in General Electric v. Seamans, 340 F.Supp. 636 (1972), is equally applicable here:

"There is little doubt that the overriding public interest lies in having the governmental agencies follow their own regulations. Scanwell Laboratories, Inc., *supra*, at 424 F.2d 864." 340 F.Supp. at 641.

This case concerns the manner in which contracting officials make discretionary determinations in their administration of government contracts. It is imperative that such decisions reflect a fair and objective consideration of the contract itself along with any questioned actions taken by the parties pursuant to contract terms from which the dispute issues. Procurement activities cannot be allowed to "deteriorate into actions reflecting personal predilictions of administrative officials, whether ascribable to whim, misplaced zeal, or impermissible influence." Steinthal v. Seamans, *supra*, 455 F.2d at 1305. The facts here indicate that the Contracting Officer at the time of his decision in question had responsibility for 110 contracts involving a total of half a billion dollars, of which the IEC contract accounted for less than 1% of his workload. For that reason, the Government contends that the Contracting Officer was entirely reasonable in relying so fully on the suggestions of his advisors. The Court must fault such "organizational" decisions whose roots are precariously implanted in the quicksand of speculation. (See page 653, *supra*). It is unreasonable for the Contracting Officer to accept unsubstantiated opinions of his advisors without testing them for their adversariness. It is in the public interest that reason and not convenience be the basis for a Contracting Official's decision.

## IV. CONCLUSION

The critical decision-making stage for resolving disputes arising under the Rights in Technical Data clause of any Government contract is at the contracting officer level. That is the intent of the Armed Services Procurement Regulations. Therefore it is of absolute necessity that contracting officers make

decisions in a fair and reasoned fashion. In circumstances like those before the Court where a contracting officer relies upon the unsubstantiated and untested opinions of his advisors, he betrays the basic consideration of fairness which this Court demands of Government officials acting pursuant to administrative regulations. In addition, such reliance by a contracting officer effectively shields the questionable opinion from adequate testing by accepted principles of procedural due process. In the field of procurement, unless courts require of contracting officers no less than the fairness referred to above, small contractors will never be able to test the decisions of the contracting officer when, as here, the contractors cannot avail themselves of any administrative remedies.

For the above reasons, the Court has decided to grant IEC the preliminary injunction it seeks.

In addition to this Opinion, the Court, this day, the 23rd of October, 1973, has entered Findings of Fact and Conclusions of Law and a separate Order.

## APPENDIX

7–104.9 *Rights in Data*

(a) *Basic Data Clause.* In accordance with 9–203, insert the following clause

## RIGHTS IN TECHNICAL DATA (1965 FEB)

(a) *Definitions*

(1) *Technical Data,* as used in this clause, means technical writing, sound recordings, pictorial reproductions, drawings, or other graphic representations and works of a technical nature, whether or not copyrighted, which are specified to be delivered pursuant to this contract. The term does not include financial reports, cost analyses, and other information incidental to contract administration.

(2) *Limited Rights* means rights to use, duplicate, and disclose technical data in whole or in part, by or for the Government, with the express limitation that such data may not be released outside the Government, used, duplicated, or disclosed in whole or in part, for manufacture or procurement, except for:

> work by or for the Government where the item or process concerned is not otherwise reasonably available to enable timely performance of the work; and
>
> as the interests of the United States may require;

*provided,* in either case, that the release of such data shall be subject to the limitations of this paragraph (2).

(3) *Unlimited Rights* means rights to use, duplicate or disclose technical data, in whole or in part, in any manner and for any purpose whatsoever, and to have or permit others to do so.

(b) *Government Rights.*

(1) The Government shall have unlimited rights in:

(i) technical data resulting directly from performance of experimental, developmental or research work which was specified as an element of performance in this or any other Government contract or subcontract;

(ii) technical data necessary to enable manufacture of end-items, components and modifications, or to enable the performance of processes, when the end-items, components, modifications or processes have been, or are being, developed under this or any other Government contract or subcontract in which experimental, developmental or research work is, or was specified as an element of contract performance, except technical data pertaining to items, components or processes developed at private expense (but see (2) (ii) below);

(iii) technical data constituting corrections or changes to Government-furnished data;

(iv) technical data pertaining to end-items, components or processes which was prepared for the purpose of identifying sources, size, configuration, mating and attachment characteristics, functional characteristics and performance requirements ("*form, fit and function*" data, e. g., specification control drawings, catalog sheets, envelope drawings, etc.);

(v) manuals or instructional materials prepared for installation, operation, maintenance or training purposes;

(vi) other technical data which has been, or is normally furnished without restriction by the contractor or subcontractor; and

(vii) technical data listed or described in an agreement incorporated into the Schedule of this contract, which the parties have predetermined, on the basis of subparagraphs (i) thru (vi) above, and agreed will be furnished with unlimited rights.

(2) The Government shall have limited rights in:

(i) technical data, listed or described in an agreement incorporated into the Schedule of this contract, which the parties have agreed will be furnished with limited rights; and

(ii) technical data pertaining to items, components or processes developed at private expense, other than such data as may be included in the data referred to in (b)(1)(i), (iii), (iv), (v), and (vi);

*provided* that each piece of data to which limited rights are to be asserted pursuant to (2)(i) and (ii) above is marked with the following legend in which is inserted the number of the prime contract under which the technical data is to be delivered and the name of the Contractor or subcontractor by whom the technical data was generated:

Furnished under United States Government Contract No. _____. Shall not be either released outside the Government, or used, duplicated, or disclosed in whole or in part for manufacture or procurement, without the written permission of _____, except for: (i) emergency repair or overhaul work by or for the Government, where the item or process concerned is not otherwise reasonably available to enable timely performance of the work; or (ii) release to a foreign government, as the interests of the United States may require; *provided* that in either case the release, use, duplication or disclosure hereof shall be subject to the foregoing limitations. This legend shall be marked on any reproduction hereof in whole or in part.

No legend shall be marked on, nor shall any limitation on rights of use be asserted as to, any data which the Contractor has previously delivered to the Government without restriction. The limited rights provided for by this paragraph (b)(2) shall not impair the right of the Government to use similar or identical data acquired from other sources.

(c) *Material Covered by Copyright.*

(1) Notwithstanding the provisions of (b) above, the Contractor agrees to and does hereby grant to the Government, and to its officers, agents, and employees acting within the scope of their official duties, a royalty free, non-exclusive and irrevocable license throughout the world for Government purposes to publish, translate, reproduce, deliver, perform, dispose of, and to authorize others so to do, all technical data now or hereafter covered by copyright.

(2) No such copyrighted matter shall be included in technical data furnished hereunder without the written permission of the copyright owner for the Government to use such copyrighted matter in the manner described above.

(3) The Contractor shall report to the Government (or higher-tier Contractor)

promptly and in reasonable written detail each notice or claim of copyright infringement received by the Contractor with respect to any technical data delivered hereunder.

(d) *Removal of Unauthorized Markings.* Notwithstanding any provisions of this contract concerning inspection and acceptance, the Government may modify, remove, obliterate, or ignore any marking not authorized by the terms of this contract on any technical data furnished hereunder, if—

(i) the Contractor fails to respond within sixty (60) days to a written inquiry by the Government concerning the propriety of the use of the marking, or

(ii) the Contractor's response fails to substantiate his contention that the use of the marking is authorized, in which case the Government shall give written notice to the Contractor.

(e) *Relation to Patents.* Nothing contained in this clause shall imply a license to the Government under any patent or be construed as affecting the scope of any license or other right otherwise granted to the Government under any patent.

### CONTRACT CLAUSES

(f) *Limitation on Charges for Data.* The Contractor recognizes that the Government, or a foreign government with funds derived through the Military Assistance Program or otherwise through the United States Government, may contract for property or services with respect to which the vendor may be liable to the Contractor for charges for the use of technical data on account of such a contract. The Contractor further recognizes that it is the policy of the Government not to pay in connection with its contracts, or to allow to be paid in connection with contracts made with funds derived through the Military Assistance Program or otherwise through the United States Government, charges for data which the Government has a right to use

and disclose to others, which is in the public domain, or which the Government has been given without restrictions upon its use and disclosure to others. This policy does not apply to reasonable reproduction, handling, mailing, and similar administrative costs incident to the furnishing of such data. In recognition of this policy, the Contractor agrees to participate in and make appropriate arrangements for the exclusion of such charges from such contracts, or for the refund of amounts received by the Contractor with respect to any such charges not so excluded.

(g) *Acquisition of Data from Subcontractors.*

(1) Whenever any technical data is to be obtained from a subcontractor under this contract, the Contractor shall use this same clause in the subcontract, without alteration, and no other clause shall be used to enlarge or diminish the Government's or the Contractor's rights in that subcontractor data which is required for the Government.

(2) Technical data required to be delivered by a subcontractor shall normally be delivered to the next higher-tier Contractor. However, when there is a requirement in the prime contract, or in the deferred order, for data which may be supplied with limited rights pursuant to (b)(2) above, a subcontractor may fulfill such requirement by submitting such data directly to the Government rather than through the prime Contractor.

(3) The Contractor and higher-tier subcontractors will not use their power to award subcontracts as economic leverage to acquire rights in data from their subcontractors for themselves.

(b) *Notice of Certain Limited Rights.* In accordance with 9–203(c), add the following paragraph (h) to the above Basic Data Clause.

(h) The Contractor will promptly notify the Contracting Officer in writing of the intended use in the performance of the contract of any end-item, component, modification or process for which the

Contractor intends to furnish data with limited rights; *provided,* that no such notice is required with respect to standard commercial items which are manufactured by more than one source of supply or with respect to data which the parties have specified in the Schedule would be furnished with limited rights. Subcontractors will notify the next higher-tier Contractor. (1965 FEB)

(c) *Technical Data Clause—Specific Acquisition.* In accordance with 9-203(d), insert the following clause.

RIGHTS IN TECHNICAL DATA—SPECIFIC ACQUISITION (1964 MAY)

(a) *Definition. Technical Data* as used in this clause means technical writings, sound recordings, pictorial reproductions, drawings, or other graphic representations and works of a technical nature, whether or not copyrighted, which are specified to be delivered pursuant to this contract. The term does not include financial reports, cost analyses, and other information incidental to contract administration.

(b) *Government Rights.* The Government may duplicate, use and disclose in any manner and for any purpose whatsoever, and have others so do, all or any part of the technical data delivered by the Contractor to the Government under this contract.