INTERNATIONAL ENGINEERING
COMPANY, DIVISION OF
A–T–O, INC.

v.

Elliott L. RICHARDSON, Secretary of
Defense, et al., Appellants.

No. 74–1192.

United States Court of Appeals,
District of Columbia Circuit.

Argued Feb. 24, 1975.

Decided May 2, 1975.

Rehearing and Rehearing En Banc
Denied June 19, 1975.

David M. Cohen, Atty., Dept. of Justice, with whom Carla A. Hills, Asst. Atty. Gen., Earl J. Silbert, U. S. Atty., and Stephen F. Eilperin, Atty., Dept. of Justice, were on the brief for appellants. Robert M. Werdig, Jr., Asst. U. S. Atty., also entered an appearance for appellants.

Robert H. Turtle, Washington, D. C., with whom James M. McHale, Washington, D. C., was on the brief for appellee.

Opinion for the Court filed by Circuit Judge TAMM.

Before TAMM and LEVENTHAL, Circuit Judges, and MILLER,* Judge, United States Court of Customs and Patent Appeals.

TAMM, Circuit Judge:

Appellant challenges the propriety of the district court's issuance of a preliminary injunction against the United States enjoining it from distributing certain test reports submitted pursuant to a government contract because of the likelihood that the Air Force erroneously failed to recognize appellee International Engineering Company's (IEC) proprietary interest in certain data contained in the reports. For the reasons stated below, we hold that the injunction was improper as the district court lacked subject-matter jurisdiction and order the injunction vacated and the case dismissed.

## I

In February, 1968, appellee IEC submitted to the United States Air Force an unsolicited proposal concerning its privately developed long-range navigation (LORAN C/D) bomb/missile guidance system. On July 7, 1969, the parties contracted for construction of a breadboard model of the LORAN C/D system (referred to by the parties as "Unit A"), performance of certain laboratory and helicopter flight tests, and delivery to the Air Force of a final report on the tests. Specifically incorporated by reference as contract clauses were forty-four contract provisions set forth in the Armed Services Procurement Regulations (ASPR), 32 C.F.R. pts 1–30 (1974), including the "Rights in Technical Data" Clause (ASPR 7–104.9(a)) and the standard "disputes clause" (ASPR 7–103.12), establishing mechanisms for resolving contract disputes.

By the spring of 1970, IEC had developed a more compact LORAN C/D system. Thereafter, on October 27, 1970, the parties modified the contract to test the system with the new developments. IEC again agreed to construct a breadboard model of the new subsystem (referred to by the parties as "Unit B") and to submit test reports.

In late March, 1971, the Air Force directed IEC to provide further information concerning the components and

* Sitting by designation pursuant to 28 U.S.C. § 293(a).

processes to help it evaluate the test results. IEC submitted the data, in an interim report, 71–05, and in its contractually-mandated Final Report 70–06–4. Both reports were marked with notice of "limited rights," restricting the Air Force's distribution rights to the Unit B data.

By letter of April 19, 1971, the Air Force contracting officer questioned the propriety of the restrictive legend (limited rights) on Final Report 70–06–4, referred appellee to the "Rights in Technical Data" clause of the contract, and requested a prompt response "to why the Government does not have the right to remove the legends in question." A. 46. IEC responded on June 15, 1971 that Unit B had been "developed and built at contractor expense, and [had] been made available for this effort on a no charge loan basis." IEC maintained that its contractual obligation to submit a final report "could have been met without inclusion of proprietary information" and that "[i]f the Air Force requires unlimited rights" in the report, IEC would revise the report by deleting the data. A. 48–49.

On June 30, 1971, the parties again negotiated a contract modification which required IEC to conduct further tests and submit test reports; on July 7th, the Air Force accepted Report 70–06–4.[1] On October 15, 1971, appellee submitted Interim Report 71–07 and then on December 10, 1971, Report 71–09 as the concluding report under its contractual obligations; both reports contained limited rights notices covering the same information submitted in Report 70–06–4.

By letter on December 28, 1971, the contracting officer, again referring to the "Rights in Data" clause, notified IEC that Report 71–09, "even if found to be technically correct", would not be accepted until appellee either removed or substantiated all proprietary markings. A. 50. Expressing surprise that the issue had resurfaced, IEC on January 5, 1972, reviewed the history of the parties' course of dealing, asserted that Report 70–06–4 had been accepted with proprietary restrictions, offered to delete the data, and reiterated its belief that the restrictions were appropriate. A. 51–52.

The next official exchange occurred on June 5, 1972, when the Air Force again informed IEC that it had failed to substantiate its limited rights notices and that the Air Force intended to strike them and use the data with unlimited rights. A. 53–54. On June 26, 1972, representatives of both parties participated in a two-hour meeting on the matter; IEC was asked to provide further detail and written documentation so that its claim could be forwarded to higher headquarters. The Air Force agreed to treat the data with limited rights during the pendency of the dispute. Soon thereafter final payment was made on the contract.

Not having received any additional documentation by October, 1972, the contracting officer again notified IEC of the Air Force's intention to utilize the data with unlimited rights. IEC immediately protested the report's imminent release to the Director of the Defense Documentation Center and the Secretary of the Air Force. In December, 1972,

1. IEC maintains that the acceptance of the report created a reasonable expectation that "the rights in data question had been resolved in [IEC's] favor and that the Air Force would not object to the attachment of the 'limited rights' legend on data in subsequent reports describing IEC private-developed processes and components." Appellee's Br. at 19. See also IEC's letter of Jan. 5, 1972, A. 51. However, Air Force officials involved later indicated: "it was decided that the contention over the proprietary markings was a separate entity from the technical acceptance. . . ." Harshfield Dep. Ex. 1. That latter view is clearly correct; part of the Rights in Technical Data clause incorporated into the contract authorizes the Government to correct or cancel any marking "[n]otwithstanding any provision of this contract conerning . . . acceptance." ASPR 7–104, 9(a)(d). Although there is no record evidence of any waiver or modification of that clause, the district court held that the Government was estopped. International Engineering Co. v. Richardson, 367 F.Supp. 640, 656 n.12 (D.D.C. 1973). We do not reach the correctness of this holding.

IEC received assurances that the material would not be released until a decision was made on the "limited rights" question.

In January, 1973, the contracting officer's technical and legal advisors briefed headquarters personnel of the Air Force Systems Command (AFSC) and United States Air Force (USAF). IEC's counsel met with Counsel to the Secretary of the Air Force and representatives of AFSC and USAF. At the Secretary's Counsel's request, IEC submitted further written materials on February 8, 1973. A. 58–60. On March 16, 1973, the Air Force Chief of Staff authorized AFSC to make a final decision on the dispute after considering IEC's February 8th submission. AFSC returned the matter to the contracting officer for final decision. That officer's technical advisor concluded that the letter of February 8th contained no information relevant to the issue and recommended striking the limited rights notice. On May 9, 1973, IEC was so informed.

On May 10, 1973, IEC filed suit in district court for declaratory and injunctive relief and a temporary restraining order. IEC sought review of the contracting officer's decision to strike the

proprietary notice, characterizing it as agency action reviewable under section 10 of the Administrative Procedure Act (APA), 5 U.S.C. § 702 (1970). The Air Force contended that the dispute arose under the contract; that the officer's decision did not constitute agency action; that the proper forum for the claim was either before the Armed Services Board of Contract Appeals or the Court of Claims; and that thus the district court lacked subject matter jurisdiction or the suit was barred by sovereign immunity.

In a Memorandum and Order filed July 10, 1973, the district court held that the decision of a contracting officer, acting pursuant to an ASPR provision incorporated into a contract, constituted agency action and that the APA served as a waiver of sovereign immunity. International Engineering Co. v. Richardson, 361 F.Supp. 818, 821–22 (D.D.C. 1973). However, the judge believed that the record of the officer's reasoning was insufficient to permit judicial review of the decision to strike the restrictive notice and remanded the case to the officer for a fuller exposition. *Id.* at 823–25. After receiving that statement,[2] on October 24, 1973, the district court entered a preliminary injunction.[3] International

---

2. In his statement of reasons, the contracting officer noted that "[r]esolution of the data rights problems concerning Unit B is difficult, and may be impossible for the Government to resolve." He emphasized that:

> The Rights in Technical Data clause, paragraph (d), places the burden of substantiating the propriety of restrictive legends on the contractor because his cooperation is needed to resolve this type of problem. All pertinent records are in his possession. Many important details are locked in his mind. It may be necessary for him to explain the significance of some record entries.

A. 63.

The officer relied upon the contract clause which granted IEC proprietary rights only if Unit B had been developed at private expense and opined that development includes the demonstration by testing that a prototype fulfills the developer's objective. He pointed out that the Government regards even one percent Government funding as precluding a finding of development at private expense and as resulting in the Government obtaining 100

percent unlimited rights. He indicated that a substantial possibility existed that the final phases of development of Unit B—testing—were performed with contract funds. Under any circumstance, he reemphasized that IEC had failed to meet its contractually-allocated burden of substantiation. A. 62–76.

3. After reviewing its previous decision and holding that the APA provided subject-matter jurisdiction and waived sovereign immunity, the district court found that the interests identified in Scanwell Laboratories, Inc. v. Shaffer, 137 U.S.App.D.C. 371, 424 F.2d 859 (1970)—IEC's interest in preventing injury from any illegal, arbitrary and capricious action by the contracting officer and the public interest in having government contracts administered fairly—dictated a limited review. The district court concluded that the grant of a preliminary injunction was proper under the standards established by this court in Virginia Petroleum Jobbers Ass'n v. FPC, 104 U.S. App.D.C. 106, 259 F.2d 921, 925 (1958): 1) appellee was likely to succeed on the merits because the contracting officer failed to provide minimal due process before striking the

Engineering Co. v. Richardson, 367 F.Supp. 640 (D.D.C.1973). This appeal followed.

## II

This suit raises the special problems of jurisdiction and sovereign immunity because in essence the United States is the defendant here. The general rule of sovereign immunity is that the United States cannot be sued without its consent. *E. g.,* United States v. Sherwood, 312 U.S. 584, 586, 61 S.Ct. 767, 85 L.Ed. 1058 (1941). The sovereign may waive its immunity by statute, and such consent, if given, may be subject to any conditions which Congress sees fit to require. *See, e. g.,* Sherwood v. United States, *supra*; Best Bearings Co. v. United States, 463 F.2d 1177, 1179 (7th Cir. 1972). On the one hand, for contract actions against the United States, Congress, through passage of the Tucker Act, 28 U.S.C. §§ 1346(a), 1491 (1970), has consented to suit. For claims under $10,000, the Court of Claims and the district courts have concurrent jurisdiction; the Court of Claims has exclusive jurisdiction for claims over $10,000. Congress has, however, imposed conditions on its waiver of sovereign immunity. The Court of Claims has jurisdiction only to award damages, Glidden v. Zdanok, 370 U.S. 530, 577, 82 S.Ct. 1459, 8 L.Ed.2d 671 (1962); it may neither grant declaratory, United States v. King, 395 U.S. 1, 89 S.Ct. 1501, 23 L.Ed.2d 52 (1969), nor injunctive relief, Glidden v. Zdanok, *supra*.[4]

On the other hand, we have held that Congress, in enacting the APA, made a more general waiver of sovereign immunity in section 702[5] whenever that section is applicable. Scanwell Laboratories, Inc. v. Shaffer, 137 U.S.App. D.C. 371, 424 F.2d 859 (1970). The district court, relying in large part on *Scanwell,* found jurisdiction in this case. In its first opinion, 361 F.Supp. at 821–23, the court concluded that IEC was "aggrieved" by agency action—the acts taken by the contracting officer pursuant to the Rights in Technical Data clause "which has the force of law in this Contract."[6] While conceding that *Scanwell* was not directly on point, the court asserted that the primary concerns identified in that case—plaintiff's interest in preventing economic injury and the public's interest in preventing arbitrary or capricious action—were present here and justified accepting jurisdiction. Finally, the court said that in exercising jurisdiction it was providing the only forum from which appellee could obtain injunctive relief as the Court of Claims and

restrictive legends; 2) appellee would be irreparably injured without relief in that it would lose its competitive advantage; 3) the injunction would not substantially harm other interested persons; and 4) the public interest would be served. 367 F.Supp. at 649–57. In light of our conclusion on jurisdiction and sovereign immunity, *infra,* we do not reach the remainder of the district court's decision.

4. The district court, when exercising concurrent jurisdiction, may only adjudicate claims which would also be maintainable in the Court of Claims. United States v. Sherwood, 312 U.S. 584, 590–91, 61 S.Ct. 767, 85 L.Ed. 1058 (1941). Hence, in such situations, the district court would have no authority to grant equitable relief. Richardson v. Morris, 409 U.S. 464, 93 S.Ct. 629, 34 L.Ed.2d 647 (1973).

5. 5 U.S.C. § 702 (1970) provides:

A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof.

6. This portion of the district court's opinion is particularly confusing. In the text, reference is made to "ASPR 9–203(a)–(d) which has the force of law in this Contract.2" That section instructs contracting officers to include ASPR 7–104.9(a), the uniform Rights in Technical Data contract clause, in any appropriate contract. In the footnote, the court opines that there is no authority that "an ASPR once incorporated as a contract clause parts with all identity as a federal regulation governing certain acts of Contracting officers." Presumably, the court is now discussing, as it has been all along, ASPR 7–104.9(a) (not ASPR 9–203), which was incorporated into the contract. In that same footnote, the court went on to note that several cases had suggested that the ASPR had the force of law and asserted its belief that IEC could invoke an ASPR "against an administrative determination contrary to the regulation's terms." 361 F.Supp. at 822 n.2.

Armed Services Board of Contract Appeals could not grant such relief.

In its second decision, 367 F.Supp. 640, the court began from the premise that even if it possessed jurisdiction, the decision to grant judicial relief was discretionary. *Id.* at 647–48; *see* M. Steinthal & Co. v. Seamans, 147 U.S.App.D.C. 221, 455 F.2d 1289 (1971). The court then concluded that relief was appropriate both to vindicate the interests identified earlier and because of the court's doubt over the likelihood of the adequacy of a damage remedy in the Court of Claims. Recognizing that neither the only potential buyer of products relating to the data, the United States, nor IEC itself foresaw any practical value in the information (except as for what type of research not to do), the court opined it was "more important" that IEC received injunctive, rather than compensatory, relief. 367 F.Supp. at 649.

■ We must disagree with that analysis and conclusion. We believe that this case is a contract action falling squarely within the purview of the Tucker Act; therefore, the APA is inapplicable. As indicated below, several converging avenues of analysis yield this conclusion. First, reliance on interests identified in *Scanwell* are inappropriate here. Moreover, we cannot accept the proposition that Congress intended to alter drastically the limited remedies and waiver of sovereign immunity embodied in the Tucker Act; adopting IEC's position would result in the destruction of the Court of Claims by implication. Finally, under any circumstance, the APA is inapplicable by its own terms because of appellee's adequate remedy before the Court of Claims.

We start with our firm belief that the gravamen of appellee's complaint is a claim for breach of contract. Although the restrictive markings in question were affixed to reports submitted pursuant to the contract, appellee contends that the material at issue was not required to be included in its reports, Appellee's Br. at 7, 47; resolution of that question is a matter of contract interpretation. The major controversy concerns the Government's rights in the data under the contractually incorporated "Rights in Technical Data" clause. Settlement of that dispute requires interpretation of contract clauses to ascertain whether the material should be considered "design" or "form, fit, or function" data.

A reading of the district court opinions demonstrates its recognition of the contractual underpinnings of the proceedings. The district court applied as one of alternative standards of review "settled principles of contract law." 367 F.Supp. at 649. The court also determined that review was appropriate because of the public interest in preventing arbitrary or capricious decision-making in the administration of government contracts, stating that the court "must undertake a limited review of the contracting officer's *decisions* rendered pursuant to the Rights in Data clause to determine whether it is likely that he acted arbitrarily and without a rational basis." *Id.* at 648, 650. Clearly that function cannot be performed without reference to and incorporation of the contract.

We think that this situation is indistinguishable from the one faced by this court in Aktiebolaget Bofors v. United States, 90 U.S.App.D.C. 92, 194 F.2d 145 (1951), involving a Swedish Corporation, Bofors, which owned a trade secret used to manufacture a superior anti-aircraft gun. Bofors entered into a government contract which granted the United States an exclusive license to make and use the guns. After the United States began to reveal the trade secrets to others and after unsuccessfully attempting to obtain equitable adjustments through informal negotiations, Bofors instituted three suits, including one for damages and another for a declaratory judgment. District Judge Holtzoff dismissed the actions for lack of jurisdiction. In affirming, Judge Miller, speaking for the division, found that the gist of the actions was breach of contract:

one who has lawfully acquired a trade secret may use it in any manner without liability unless he acquired it sub-

ject to a contractual limitation or restriction as to its use. In that event a licensee who uses the secret for purposes beyond the scope of the license granted by the owner is liable for breach of contract, but he commits no tort, because the only right of the owner which he thereby invades is one created by the agreement of disclosure. The owner could not maintain a suit against him for damages arising from unlicensed use without pleading and proving the contract. This being true, the gist of the owner's action is the breach of the licensing agreement.

*Id.* at 148 (footnotes omitted). IEC's complaint here is no different.[7]

In *Bofors,* Judge Miller also held that the APA did not provide jurisdiction to hear either the damage or equity suit and that jurisdiction lay in the Court of Claims. *Id.* at 149–50. We do not rest our present ruling on stare decisis, however, because the *Bofors* decision preceded the extensive jurisprudence in this circuit sustaining the APA as a basis of jurisdiction,[8] and thus it seems appropriate to analyze whether the district court fairly applied the APA and *Scanwell* to the claim of this government contractor. We think it did not.

First, clearly beyond peradventure, this case is not the type which falls within the rationale of our *Scanwell* holding. In *Scanwell,* we determined that a disappointed bidder on a government contract was a person aggrieved under the APA and had standing to seek a limited review of the contract award; we also held that where applicable the APA constituted a waiver of sovereign immunity.

Although the sovereign immunity holding has relevance here, our direct concern in *Scanwell* was standing, "whether legislation regulating governmental activity inures to the benefit of those tangentially affected." *William F. Wilke, Inc. v. Department of Army,* 485 F.2d 180, 183 (4th Cir. 1973). In contrast, while our focus in this case, as in *Scanwell,* is upon the same judicial review section of the APA, the question here is whether appellee has been aggrieved "by agency action;" our inquiry is to determine whether the decision by the contracting officer to strike IEC's limited rights designation constituted agency action.

Clearly, our *Scanwell* decision does not directly resolve that question. Conceivably, the interests identified in *Scanwell* which dictated a finding of standing may be applicable by analogy here and mandate a finding of agency action. In fact, this type of analysis appears to be the foundation of the district court opinions, especially the reliance upon the identification of an equivalent public interest as the one identified in *Scanwell* —the public interest in having contracts administered fairly and in preventing arbitrary and capricious decision-making by contracting officers. *See* 367 F.Supp. at 648; 361 F.Supp. at 823. However, we are extremely reluctant to give that factor the weight the district court attached to it in this situation. What has been identified unsurprisingly is the public's interest in minimizing the number of actions taken by contracting officers which results in breaches of governmental contracts and which may necessitate the payment of compensatory damages

---

7. Clearly, the dispute on its face involves the Government's rights under the licensing agreement (contract) to IEC's trade secret. Even assuming the validity of the district court's finding of estoppel, *see* note 1 *supra,* the claim is still for breach of contract; under that theory IEC is alleging that the Government breached a licensing agreement which gave them the use of the data with limited rights.

8. Peoples v. Department of Agriculture, 138 U.S.App.D.C. 291, 427 F.2d 561 (1970); Scanwell Laboratories, Inc. v. Shaffer, *supra; see* Pickus v. Board of Parole, 507 F.2d 1107

(D.C.Cir. 1974); Independent Broker-Dealers' Trade Ass'n v. SEC, 142 U.S.App.D.C. 384, 442 F.2d 132 (1971).

The district court was not apparently aware of the *Bofors* decision, for its opinions do not cite the case. Appellant relies upon it only as authority for a peripheral issue and actually only cites the district court opinion. *See* Appellant's Br. at 21 n. 11. Although part of the *Bofors* analysis was undercut by the cases cited above, the obvious pertinence of the *Bofors* ruling should have been called to the attention of the courts.

by the government. This interest, of course, is present in every decision made by an officer pursuant to a contract to which the Tucker Act applies.

The breadth of the district court's holding poses the greatest difficulty: to grant jurisdiction here by a finding of agency action ,would enable a district court to entertain a suit for injunctive relief each time a contracting officer makes a determination adverse to a private contracting party.

■■■ We simply do not think that such a result is mandated or that Congress intended to upset the carefully modulated waiver of sovereign immunity and grant of remedies for breach of contract embodied in the Tucker Act when it passed the APA. The Fifth Circuit, faced with this prospect in a case involving an injunction granted upon the basis of APA jurisdiction, refused to find such jurisdiction:

> Since the United States by reason of its nature acts only through agents, it is hard to conceive of a claim falling no matter how squarely within the Tucker Act which could not ·be urged to involve as well agency error subject to review under the APA. Little imagination is needed to foresee the consequences of a holding that such claims as this may be reviewed either in a court having power to grant equitable relief against the United States or in one having none. We refuse to

believe that Congress intended, in enacting the APA, so to destroy the Court of Claims by implication.

Warner v. Cox, 487 F.2d 1301, 1306 (5th Cir. 1974). We join in that assessment.[9] We think it is clear that Congress did not intend that every action taken by an employee of a federal agency be within the ambit of the APA judicial review section. We also believe that in light of the long-standing Tucker Act remedy and the traditionally long-recognized interest in preventing piecemeal disruption of the procurement process, e. g., M. Steinthal & Co. v. Seamans, supra, decisions made by contracting officers pursuant to contract clauses fall outside the contemplation of the statute.[10]

Moreover, the APA itself states that judicial review is inappropriate where there exists some "other adequate remedy in a court." 5 U.S.C. § 704 (1970). We have held that the availability of a remedy in the Court of Claims is such an adequate remedy. Mohawk Airlines, Inc. v. C.A.B., 117 U.S.App.D.C. 326, 329 F.2d 894 (1964). The district court, however, concluded that damages would be an inadequate remedy, because of the speculative nature of damages in light of the Government's belief, as the only potential buyer, that the information is useless except for what not to do, and that injunctive relief would be appropriate in order to vindicate the public interest in

---

**9.** Appellee points to Universal Fiberglass Corp. v. United States, 400 F.2d 926 (8th Cir. 1968), as support for a finding of jurisdiction, asserting that in that case the Government was able to enforce a contract in district court. We cannot accept the IEC's argument that "Universal Fiberglass clearly establishes jurisdiction"; such an assertion indicates a complete lack of understanding of the real issues in this case—sovereign immunity and the extent of its waiver for contract actions.

**10.** Stripped of its plumage, this case is not too different than Larson v. Domestic & Foreign Commerce Corp., 337 U.S. 682, 702, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949). The dispute in Larson concerned interpretation of when payment was required upon a' coal shipment. After receiving an unfavorable ruling from the War Assets Administration, plaintiff sued for equitable relief. The Court found that the

suit was barred by sovereign immunity and noted:

> It is one thing to provide a method by which a citizen may be compensated for a wrong done to him by the Government. It is a far different matter to permit a court to exercise its compulsive powers to restrain the Government from acting, or to compel it to act. . . . The Government . . . cannot be stopped in its tracks by any plaintiff who presents a disputed question of property or contract.

Id. at 704, 69 S.Ct. at 1468. Similarly, we see no persuasive reason why IEC should not be limited to the alternative remedies Congress has already provided.

Finally, the bar of sovereign immunity prevents the district court from asserting jurisdiction through 28 U.S.C. § 1331. Id.

proper contract administration. We have already concluded that this public interest factor should not be afforded the overriding weight that the district court gave to it. We further question whether damages are impossible to award. We see no barrier to the Court of Claims, if it decides that the Government has breached the contract, awarding IEC the fair market value of its data. *See* Aktiebolaget Bofors v. United States, 153 F.Supp. 397, 139 Ct.Cl. 642 (1957).[11]

In sum, we find compelling reasons not to endorse the district court's analysis, but to reaffirm the vitality of our *Bofors* holding. IEC's claim is for breach of contract, and appellee should not be permitted to seek injunctive relief in the district court. Section 702 is inapplicable to this case and does not provide jurisdiction here. The case is reversed and remanded with instructions to vacate the injunction and dismiss the case for lack of subject matter jurisdiction.

So ordered.

---

11. IEC has a further alternative remedy—before the General Accounting Office. Assuming that the Government wrongfully discloses the information, it still constitutes the only market for a LORAN system. In that event, the Comptroller General has the power to cancel future procurements made to competitors who wrongfully have acquired the information; IEC would then become the sole supplier of the product.