**GOLDEN EAGLE REFINING COMPANY, INC.**

v.

**The UNITED STATES.**

No. 65–84C.

United States Claims Court.

Feb. 22, 1984.

Harry R. Silver, Washington, D.C., for plaintiff. Jerry E. Rothrock and Akin, Gump, Strauss, Hauer & Feld, Washington, D.C., of counsel.

R. Anthony McCann, Washington, D.C., with whom was Acting Asst. Atty. Gen., Richard K. Willard, Washington, D.C., for defendant.

## OPINION

LYDON, Judge:

On February 13, 1984, plaintiff filed a motion for a Temporary Restraining Order (TRO) and a motion for a Preliminary Injunction together with a complaint which sought a preliminary and permanent injunction restraining defendant, acting through the Defense Fuel Supply Center (DFSC), a primary level field activity of the Defense Logistics Agency (DLA), Department of Defense (DoD), from awarding any contracts for the supply of JP–4 jet fuel that was the subject of Contract DLA600–82–D–0456 (hereinafter D–0456). The complaint, as an alternative, sought damages resulting from defendant's alleged unlawful termination of D–0456.

Under D–0456, entered into on October 21, 1981, plaintiff was to supply DFSC with JP–4 jet fuel for a 5-year period. On December 14, 1983, DFSC terminated this con-

tract. However, this contract was extended by agreement of the parties through the end of February 1984. Plaintiff contends that it is entitled to injunctive relief because the termination of D–0456, which had almost 3 more years to run, was illegal. It claims that subsequent to termination of D–0456, DFSC issued a Request for Proposals seeking a supplier or suppliers to replace plaintiff as supplier of JP–4 jet fuel. Plaintiff's position, simply stated, is that the Request for Proposals and the proposed procurement is unlawful because plaintiff's 5-year contract is still in full force and effect since it has never been lawfully terminated. Under such circumstances, plaintiff claims, it is entitled to injunctive relief, enjoining defendant, acting through DFSC, from awarding any new contracts for the supply of JP–4 jet fuel currently being supplied to DFSC by plaintiff pursuant to D–0456.

Upon the filing of the TRO, it was ascertained that DFSC would not award any further contracts relative to reprocurement of JP–4 jet fuel vis-a-vis the terminated contract (D–0456) until February 23, 1984. On February 17, 1984, a hearing on the TRO and related motion and pleading was held. At the time of this hearing, the parties had submitted briefs, supported by affidavits and documentation. The positions of the parties were fully discussed at this hearing.

For reasons which follow, it is concluded that plaintiff's motions for injunctive relief should be denied. The court further concludes that it lacks jurisdiction to address the alleged illegal termination claim set forth in the complaint.

## I.

DFSC is concerned with the worldwide procurement of refined petroleum products to satisfy DoD fuel requirements. DFSC met these fuel requirements by obtaining refined petroleum products from various suppliers. Plaintiff operates a single crude oil refinery in Carson, California. For over 24 years, plaintiff, and others, supplied JP–4, which is a military grade jet fuel, to the DoD. According to plaintiff its refinery has been engineered to produce primarily JP–4 jet fuel. Plaintiff avers that the government is the only consumer of JP–4 jet fuel.

On October 21, 1981, DFSC awarded plaintiff contract D–0456, accepting plaintiff's offer of September 8, 1981, as amended on September 18, 29, and 30, and October 1, 1981. This procurement involved, *inter alia*, the exchange of government-owned crude oil from the Naval Petroleum Reserves for JP–4 jet fuel. In other words, plaintiff was required to purchase crude oil from the government, which it would refine into JP–4 jet fuel and then resell the refined jet fuel to the government. To facilitate the evaluation of offers under this procurement, offerors such as plaintiff were requested to submit offer prices and volume for the JP–4 jet fuel portion only. Since the crude oil price was established by the solicitation as identical for all offerors, offered prices were not submitted for the crude oil.

The contract in issue was programed for 5 years, with plaintiff to supply approximately 106,898,500 gallons of JP–4 jet fuel per program year. The first ordering period ran from October 21, 1981, to November 30, 1982; the second ordering period ran from December 1, 1982, to November 30, 1983; the third ordering period ran from December 1, 1983, to November 30, 1984; the fourth ordering period ran from December 1, 1984, to November 30, 1985; and the fifth ordering period ran from December 1, 1985, to November 30, 1986.

Contract D–0456 contained, by reference, a Disputes clause and a Termination For Convenience clause. The contract also contained a Price Review clause (E50.01) which provided as follows:

(a) If during any contract year either of the parties concludes that any current contract price for JP–4 is no longer equitable, either party may upon the anniversary of contract award, open good faith negotiations regarding a new contract price. Requests for price changes shall be made in writing, at least 45 days prior

to the beginning of the next contract year, and shall indicate the date upon which any proposed price change is to become effective. The request shall be accompanied by clear and convincing evidence demonstrating that such a change is warranted.

(b) If the parties cannot reach agreement on a price for JP–4 within 30 days of the anniversary of contract award, the contractor or the Government shall have the right to request in writing that the contract be terminated, at no cost to either party, two calendar months after the date of this written request. During these two months, unless notified by the Contracting Officer to the contrary, the Contractor is still obligated to accept delivery of crude oil and/or condensate in accordance with the contract terms and to deliver JP–4 in accordance with the contract terms. Deliveries made after the effective date of the proposed change and prior to the termination date, shall be paid for at the current prices escalated to date of delivery subject, however, to retroactive adjustment if a different price is agreed upon prior to terminating the contract.

On October 14, 1982, DFSC opened negotiations with plaintiff pursuant to the Price Review clause for the second year of the five year contract program. As a result of these negotiations, plaintiff's price for JP jet fuel was reduced and a new price escalator formula was agreed to by the parties, effective December 9, 1982.

By wire dated September 15, 1983, which was more than 45 days prior to the start of the third year of the five year contract program, DFSC requested that price negotiations be opened. The September 15, 1983, wire provided in pertinent part as follows:

6. Any agreed upon change shall become effective 01 Dec 83.

7. The changes in price and escalation provisions are requested because the prices paid for JP–4 during the subject contract's second program year have consistently been outside DFSC's west coast market range. Additional documentation for the requested price change will be provided during the course of negotiations.

8. Request submission of sales data and agreement to common escalator, Clause E19.33, by COB 26 Sep 83.

On September 21, 1983, plaintiff wired DFSC in pertinent part as follows:

Golden Eagle requests that the DFSC provide us with the formula for determining the "market range" for the west coast. We also ask that the DFSC tell us their price ideas. We are interested in settling this matter as soon as possible.

The DFSC market range was constructed for each product by geographical region, using a variety of sources. This market range data included proprietary sales data submitted by offerors, as well as data published in trade journals. Because of the proprietary nature of some of this data, as well as the need for confidentiality during the course of negotiations, actual market ranges were not, as a matter of practice, released outside of DFSC.

On October 12, 1983, DFSC wired plaintiff in pertinent part as follows:

Subject contract D–0456 and DFSC message dated 15 Sep 83.

1. In addition to the reasons for the requested changes in price and escalation provisions noted in paragraph seven (7) of the above referenced message, there has been a change in the relative value of Elk Hills crude oil as measured by the bonuses bid at the time of the contract in 1981 and currently for deliveries commencing 01 Oct 83. Prices to be paid in the upcoming program year should reflect the crude oil bonuses currently being paid.

2. Further, the date of clause E50.01, Price Review, should read 1981 August vice 1981 July.

On October 17, 1983, DFSC notified plaintiff that the value of crude oil, as measured by the latest Department of Energy sale, should be reflected in the revised JP–4 contract price for the third program year. On November 11, 1983, plaintiff advised DFSC that negotiations relative to price be continued without delay.

On November 22, 1983, DFSC wrote plaintiff in pertinent part as follows:

Request your consideration of a base unit price for JP–4 of approximately $.825000 and a November Interim Billing Price of $.746170 for the third program year of the above numbered contract. The base unit price will escalate/de-escalate in accordance with the provisions of Clause E19.33. ECONOMIC PRICE ADJUST-MENT–PUBLISHED Market Price. The base unit price is tied, for final billing purposes, to the West Coast JP–4 BLS August reference of $.882000 and for interim billing purposes, to the November OPIS West Coast JP–4 reference of $.800971.

In addition, DFSC proposes increasing the crude oil prices paid to the Government under this contract by the weighted average crude oil premium of $1.99/BBL received on the last Department of Energy sale of Naval Petroleum Reserve–1 (NPR–1) Crude Oil. Failure to accept this provision may result in the termination of all or part of your contract.

Your response is requested by 28 November 1983.

Plaintiff was not happy with DFSC's price proposal of November 22, 1983, and requested a meeting on November 30, 1983, to discuss the matter advising: "These discussions will hopefully produce a better understanding between us so that we may be able to construct a viable counterproposal."

A meeting was held on November 30, 1983, attended by representatives of both sides. Discussions centered on the price of JP–4 jet fuel for the upcoming third program year. DFSC presented an analysis of recently awarded JP–4 contract prices in support of its contention that plaintiff's price of $0.866992 per gallon was unreasonably high. There was also discussion at this meeting of the impact on price of the crude oil plaintiff was receiving from the government. Under its contract, plaintiff was charged a price for crude oil which was below the current market price for crude oil as measured by the latest Department of

Energy sale of crude oil. DFSC felt there should be some lowering of plaintiff's JP–4 jet fuel price to reflect this benefit or premium that plaintiff was receiving. The meeting concluded with the understanding that plaintiff would review the situation and advise DFSC of its position.

By wire dated December 7, 1983, DFSC restated its price position and requested plaintiff's reply by December 12, 1983. On December 9, 1983, plaintiff stated that its price would be $0.87376, effective December 1, 1983, a price concession of $0.025 per gallon from its current price. This price was deemed by DFSC to be unreasonably high when said price was compared to other data available to it. For example, plaintiff's price was higher than the highest contract price awarded during DFSC's annual 1983–1984 procurement of JP–4 jet fuel without giving any consideration to the benefit or premium plaintiff received in purchasing crude oil from the government.

From mid-September to mid-December 1983, the parties negotiated relative to the price to be paid for JP–4 jet fuel for the third program year. There were numerous telephone calls, wires and correspondence and a day-long meeting. DFSC's position was that the plaintiff's prices during the second year of the program were consistently above the high of the DFSC West Coast JP–4 market range, that plaintiff's proposed price was higher than offers DFSC received from offerors of JP–4 jet fuel for the 1983–1984 year, and that it was not unreasonable to expect a price reduction from plaintiff in recognition of the benefit plaintiff received in obtaining government crude oil, from which the JP–4 jet fuel it sells the government is refined, at a premium price. It was apparent from plaintiff's December 9, 1983, wire that further negotiations most probably would be unsuccessful.

On December 14, 1983, DFSC notified plaintiff that contract D–0456 was terminated in accordance with contract clause E50.01 because the parties were unable to reach agreement on price despite having negotiated in good faith on the matter.

Subsequent to issuance of the termination notice, DFSC advised plaintiff that it was willing to continue negotiations and that if price agreement could be reached, the termination notice could be cancelled. However, continued negotiations were not fruitful.

Pursuant to a December 21, 1983, modification request from plaintiff DFSC extended plaintiff's contract delivery period for JP–4 jet fuel until February 29, 1984.

On December 28, 1983, plaintiff proposed terminating only the crude oil portion of contract D–0456, leaving the JP–4 jet fuel portion as is. This proposal was considered and rejected by DFSC.

In January 1984, DFSC issued a reprocurement solicitation to cover the remaining third contract year volumes formerly covered by contract D–0456. This solicitation covered 71,265,667 gallons of JP–4 jet fuel, 49,885,967 of which were set aside for small business. One contract, which was not a small business set aside, was awarded on February 10, 1984, covering 21,379,700 gallons.[1] Plaintiff submitted a bid in response to the January reprocurement solicitation. Details of the solicitation, the bids, etc., were not made available to the court. As to the 49,885,967 gallons of JP–4 jet fuel set aside for small business, plaintiff was not eligible to receive a contract relative thereto since it was not a small business.

## II.

### A.

Section 1491(a)(3) of title 28 of the United States Code provides the basis for the court's injunction jurisdiction. This section enables the court "to afford complete relief on any contract claim brought before the contract is awarded." 28 U.S.C. § 1491(a)(3) (Supp. VI 1981). Decisions of this court have generally limited jurisdiction under section 1941(a)(3) to cases involving bidders responding to a government solicitation who claim that their bids were not fairly and honestly considered by the government. *Alabama Metal Products, Inc. v. United States,* 4 Cl.Ct. 530 at pp. 534–535 (1983) (J. Wiese); *Drexel Heritage Furnishings, Inc. v. United States,* 3 Cl. Ct. 718, 720–721 (1983); *Hero, Inc. v. United States,* 3 Cl.Ct. 413, 416 (1983); *Cecile Industries, Inc. v. United States,* 2 Cl.Ct. 690 (1983); *Ingersoll-Rand Co. v. United States,* 2 Cl.Ct. 373, 376 (1983). *But see Yachts America, Inc. v. United States,* 3 Cl.Ct. 447 (1983); *American Hoist & Derrick, Inc. v. United States,* 3 Cl.Ct. 198 (1983); *Quality Furniture Rentals, Inc. v. United States,* 1 Cl.Ct. 136, 139 (1983). These decisions have interpreted the "any contract claim" language in section 1491(a)(3) as referring only to an implied-in-fact contract arising out of the solicitation process. The essence of this implied-in-fact contract is that in return for the submission of a bid the United States promises that the bidder will have a fair chance to compete for the contract award.

Plaintiff in this action seeks to expand this court's avowed limited jurisdiction to include reprocurement solicitations when the alleged breach involves not the implied-in-fact contract arising from the reprocurement solicitation, but a previously awarded express contract, the termination of which necessitated the reprocurement solicitation. Essentially, plaintiff contends that under the "any contract claim" language in section 1491(a)(3), termination of any express contract in situations where there is a reprocurement solicitation is broad enough to encompass the exercise of injunctive authority by this court. Plaintiff argues that while there is no specific language in section 1491(a)(3) granting such authority, there likewise is no language prohibiting such an interpretation. Plaintiff offers no authority to support its argument. It relies primarily upon its interpretation that such a holding would further Congressional intent in enacting section 1491(a)(3) because

---

[1]. Since this contract was awarded on February 10, 1984, before plaintiff filed suit in this court, plaintiff is not entitled, in any event, to injunctive relief on this portion of the reprocurement. *See United States v. John C. Grimberg Co.,* 702 F.2d 1362 (Fed.Cir.1983).

litigants in such situations could receive both equitable and legal relief in one forum. Plaintiff concedes that if there were no reprocurement solicitation, there would be no such injunctive authority in this court.

Plaintiff's argument ignores judicial interpretation of section 1491(a)(3), both by the Federal Circuit Court of Appeals and the Claims Court. In *United States v. John C. Grimberg Co.*, 702 F.2d 1362, 1374 (Fed. Cir.1983) (*en banc*), the Federal Circuit held that this court's injunction jurisdiction extended only to pre-award bid protest cases. After *United States v. John C. Grimberg Co., supra*, a disappointed bidder has no recourse to injunctive relief in this court if the government awarded the contract prior to the filing of the action. Rather, litigants seeking injunctive relief are restricted to claims based on breach of the implied-in-fact contract guaranteeing them a fair opportunity to compete for a contract award.

■ Plaintiff's claim is really one for post-award relief. Plaintiff seeks to remedy the alleged wrongful termination of the 1981 contract, a contract awarded prior to the commencement of this action, by enjoining the reprocurement solicitation which resulted from that termination. Plaintiff makes no allegation that its bid in the subsequent solicitation was not fairly and honestly considered. Plaintiff's briefs and oral presentation make it clear that the breach which constitutes the essence of its claim is the termination of its previously awarded contract. It points to no error or defect in the reprocurement process. Plaintiff. attempts to escape this post-award defense to its claim for injunctive relief by collapsing the reprocurement solicitation into the prior terminated contract and characterizing the reprocurement solicitation and the original contract as all part of the same transaction.

■ Prior Court of Claims decisions involving reprocurement solicitations, however, make it clear that a reprocurement solicitation is a separate and distinct transaction from the award and termination of the original contract. For example, the Court of Claims held that the government could use a negotiated reprocurement even when the original contract had been an advertised procurement. *Consolidated Airborne Systems, Inc. v. United States*, 172 Ct.Cl. 588, 598–599, 348 F.2d 941, 947 (1965). Reprocurement by negotiation with only one supplier was also upheld as a reasonable method of reletting a contract. *H & H Manufacturing Co. v. United States,* 168 Ct.Cl. 873, 884–885 (1964). Further, the Court of Claims has upheld the replacement of two contracts held by a single contractor with a solicitation involving several contracts offered to several contractors. *Lester Brothers, Inc. v. United States,* 151 Ct.Cl. 536, 539 (1960). In all these cases, the reprocurement process was viewed as a separate and independent process. Plaintiff offers nothing which would serve to require that the matter be viewed any other way.

■ Decisions of this court, cited previously, have made it clear that the implied-in-fact contract which gives vitality to the injunction authority of this court related solely to the submission of a bid in response to a solicitation and the just and honest consideration of that bid in making a procurement award. These decisions, recognizing the limited scope of the court's injunction authority, have turned back efforts to expand that authority by rejecting as a basis for injunctive relief claims based on allegations of wrongdoing or impropriety which were outside the pale of the implied-in-fact parameters discussed previously. *See Alabama Metal Products, Inc. v. United States, supra; Hero, Inc. v. United States, supra; Cecile Industries, Inc. v. United States, supra; Ingersoll Rand Co. v. United States, supra; Quality Furniture Rental, Inc. v. United States, supra.* Plaintiff's efforts in this case to expand the court's injunctive authority by litigating matters beyond the pale of the implied-in-fact parameters must likewise be rejected.

The holding in this case gives due consideration to the admonition in *United States v. John C. Grimberg Co., supra,* 702 F.2d at 1372, that injunctive relief should be granted by this court only in extremely limited

circumstances. *See also CACI, Inc.—Federal v. United States,* 719 F.2d 1567, 1581 (Fed.Cir.1983). Plaintiff's broad assertion that this court has jurisdiction to grant it injunctive relief under the circumstances of this case runs counter to that admonition.

In sum, plaintiff's claim is beyond the scope of this court's injunction jurisdiction under section 1491(a)(3) because the contract rights asserted by plaintiff are based upon an express contract award prior to the filing of this action. Plaintiff, therefore, seeks post-award injunctive relief which is outside this court's injunction jurisdiction. Furthermore, this court's injunction jurisdiction extends only to a breach of a bidder's implied-in-fact contract with the government for fair and honest consideration of its bid. Since plaintiff's bid is based upon an express contract award prior to the solicitation at issue and since plaintiff asserts no breach of the implied-in-fact contract for fair consideration of its bid on the reprocurement solicitation, plaintiff cannot properly invoke this court's injunction jurisdiction.

### B.

■ Even if plaintiff's claim is assumed to be within the scope of section 1491(a)(3), to prevail on the merits of its injunctive request, plaintiff must satisfy certain requirements considered basic to any granting of injunctive relief. These criteria are: (1) the likelihood of plaintiff's success on the merits, (2) the possibility of irreparable injury including the consideration of whether there is an adequate remedy of law, and (3) the public interest. *Heli-Jet Corp. v. United States,* 2 Cl.Ct. 613, 616 (1983); *N.V. Philips Gloeilampenfabrieken v. United States,* 1 Cl.Ct. 783, 784 (1983).

■ In applying these factors to the instant case, it is clear that injunctive relief is not appropriate. First, after consideration of the submissions of both parties, it is

determined that plaintiff's likelihood of success on the merits of its termination claim is most improbable. As indicated earlier, the heart and soul of plaintiff's case rests on the invalidity of the termination of its prior contract. The materials at hand discloses that defendant negotiated with plaintiff in good faith and that the impasse between defendant and plaintiff developed as a result of both sides failing to reach agreement on a price for JP–4 jet fuel. It is to be remembered that the contract specifically provided that either side could terminate the contract if the parties were unable to agree on price. See clause E50.01, *supra.* Plaintiff's contentions that DFSC did not negotiate in good faith and that clear and convincing evidence of the need for negotiation was lacking are not supported by the affidavits and documentation submitted by the parties. Indeed, the materials at hand indicate quite clearly that plaintiff's price of jet fuel was above the prevailing market price at the time defendant requested a price renegotiation, a fact which supports and justifies recourse to price negotiation under clause E50.01. It is concluded, on the basis of the present record, that defendant complied with all contractual obligations and all procedural requirements concerning price renegotiation. As a result, plaintiff's challenge to the validity of the termination is insufficient to support the granting of injunctive relief.[2]

■ Second, plaintiff will suffer no irreparable harm since it has an adequate remedy at law for any breach of its 1981 contract. *See e.g., International Eng'g Co., Div. of A–T–O, Inc. v. Richardson,* 512 F.2d 573, 580–581 (1975), *cert. denied,* 423 U.S. 1048, 96 S.Ct. 774, 46 L.Ed.2d 636 (1976). Here if the termination is found to be defective, plaintiff will recover damages for said breach, or its recovery will be in accordance with the termination for convenience clause of its contract. It would not be unreasonable to suggest that the pres-

---

**2.** It is important to note that this determination is made in the context of considering the propriety of injunctive relief under stringent time constraints imposed by this context. As a result, this determination of improbability of success on the merits should not be construed as a decision on the merits of the propriety of the termination should the matter be pursued further by plaintiff either administratively and/or in court.

ence of the termination for convenience clause indicates that this is the only remedy available, to a contractor when its contract is terminated absent some other extraordinary circumstance, *e.g.,* fraud, bad faith. *See Nolan Bros., Inc. v. United States,* 186 Ct.Cl. 602, 606–610, 405 F.2d 1250, 1253–1255 (1969); *Librach and Cutler v. United States,* 147 Ct.Cl. 605, 610–614 (1959). Plaintiff claims that loss of this contract will put it out of business since only the government buys JP–4 jet fuel. This fact, plaintiff claims supports its contention that it will suffer irreparable injury if it loses this contract. Plaintiff, however, developed its dependency on this government contract of its own volition and should not now be allowed to ground its contention for injunctive relief on its own possibly imprudent reliance.

■ Finally, consideration of the public interest is not a significant factor in this case. To the extent that public interest is a factor, it favors refraining from enjoining defendant's reprocurement solicitation so that the government can provide for its military supplies without court interference. *See International Eng'g Co., Div. of A–T–O, Inc. v. Richardson, supra,* 512 F.2d at 580–581.

Accordingly, even if the court is deemed to have jurisdiction to consider plaintiff's claim for injunctive relief, such relief could not be awarded plaintiff since it failed to establish its right to such relief as discussed above.

### III.

In its complaint, plaintiff, as an alternative claim, seeks damages for breach of contract, contending that termination of contract D–0456 by DFSC was improper. As indicated previously, the contract contained a Disputes clause and a Termination For Convenience clause. Both clauses play important roles in the adjudication of defective termination claims.

Defendant contends that, at the present time, this court lacks jurisdiction over plaintiff's damage claim as presented in its complaint. The court agrees with defendant.

■ It is clear that the contract in question (D–0456) is subject to the Contract Disputes Act (CDA). Under section 605(a) of that Act, every claim by a contractor against the government "arising under or relating to a Government contract must be submitted in writing to the Contracting Officer for final decision." Absent a contracting officer's final decision on a written and certified claim, this court is without jurisdiction over a contract damage claim. *Conoc Constr. Corp. v. United States,* 3 Cl.Ct. 146, 147 (1983). It is conceded plaintiff has not filed a claim with the contracting officer relative to termination of its contract with DFSC. Accordingly, this court is without jurisdiction to consider the direct access damage claim set forth in the complaint.[3]

### IV.

For reasons discussed above, plaintiff's motions for a TRO and a Preliminary Injunction are denied, as is plaintiff's request for a permanent injunction. Plaintiff's complaint is likewise to be dismissed since the court is without jurisdiction at this time over the damage claim set forth therein.

---

**3.** Under section 605(c)(1) of the Contract Disputes Act, 41 U.S.C. 601 (Supp. V, 1981) a contractor is also required to certify all claims in excess of $50,000 as specified therein, when presenting them to the contracting officer. Certification of a claim pursuant to section 605(c)(1) is also a jurisdictional prerequisite to direct access litigation in this court. *W.M. Schlosser Co. v. United States,* 705 F.2d 1336, 1337 (Fed.Cir.1983); *Skelly & Loy v. United States,* —— Ct.Cl. ——, 685 F.2d 414, 416 (1982). Since plaintiff has filed no claim with the contracting officer, it obviously had not complied with the mandate of section 605(c)(1).